Argued and submitted November 1, 1999, reversed and remanded May 24, 2000

# Alice DALE,
*Appellant,*

*v.*

# Phil KEISLING,
Bruce Holliday, Colin Sorhus and Dale T. Crabtree,
*Respondents.*

## (98C-18552; CA A105873)

999 P2d 1229

B. Carlton Grew argued the cause and filed the brief for appellant.

David Schuman, Deputy Attorney General, argued the cause for respondent Phil Keisling. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

No appearance for respondents Bruce Holliday, Colin Sorhus and Dale T. Crabtree.

Before Landau, Presiding Judge, and Edmonds and Brewer, Judges.

LANDAU, P. J.

## LANDAU, P. J.

At issue in this case is whether proposed initiative Measure 2000-15 contains two or more constitutional amendments that must be voted on separately under Article XVII, section 1, of the Oregon Constitution. Secretary of State Phil Keisling (Secretary) and the trial court concluded that it does not. We conclude that it does and reverse and remand for entry of judgment reversing the Secretary's decision and declaring that Measure 2000-15 does not conform to Article XVII, section 1.

Measure 2000-15, if enacted, would amend the constitution by creating a new article, to be known as Article IX-A. In general, the measure would abolish most existing forms of taxation and replace them with a single "gross receipts" tax. It consists of 18 sections. Section (1) provides:

> **"Gross receipts tax to be primary means of generating revenue.** The gross receipts tax shall be the primary means of generating state and local government revenue. No tax, fee, assessment or other revenue-generating mechanism shall exist in this state, except as expressly provided by this Article."

(Boldface and underscoring in original.) Section (2) sets the rate of the gross receipts tax at 2.2 percent of "gross consideration." It further provides that the rate may be increased only by a "double-majority" requirement, that is, by a majority of the voters who cast ballots on the issue in a majority of the counties in the state. Section (3) provides that, in addition to the state gross receipts tax, there may be a local gross receipts tax adopted by a vote of the people in one of four prescribed local tax districts, subject to a similar double-majority requirement, namely, a majority of the votes cast from a majority of the participating precincts. Section (4) provides that the gross receipts tax must be paid by the person receiving the gross consideration, but permits employers to withhold the tax from compensation for employment and remit it directly to the state. Section (5) sets forth various exemptions from the gross consideration that is subject to the tax. Section (6) defines "gross consideration" to mean, among other things, wages, salary, tips, other compensation for employment,

rent, lease payments and other forms of income. Section (7) imposes a penalty for failure to pay the gross receipts tax. Section (8) describes a formula for the distribution of gross receipts tax revenues to state and local governments and school districts. Section (9) prohibits the state from incurring any bonded indebtedness, subject to enumerated exceptions. Section (10) specifies certain sources of revenue that are permitted in addition to the gross receipts tax, including user charges, tuition, rent, unemployment insurance taxation, fines, penalties, and the common school fund. Section (11) provides that, if federal law makes receipt of federal benefits conditional on the imposition of a state tax, the legislature must refer to the people the decision to approve the acceptance of the federal benefit and impose the required state tax. It further requires the legislature, upon voter approval of the acceptance of the federal benefits and the imposition of the required tax, to request the federal government to waive the imposition of the state tax as a condition of receipt of the federal benefits. Sections (12) through (17) include various administrative and implementing provisions.

The chief petitioners filed Measure 2000-15 with the Secretary of State. Upon receipt of the proposed measure, the Secretary issued a notice seeking public input to assist in the review of the measure for compliance with constitutional requirements. Plaintiff submitted comments in which she suggested that the measure contained more than one amendment to the constitution and could not be submitted as a single amendment under Article XVII, section 1. The Secretary disagreed and approved the form of the measure.

Plaintiff then initiated this action for judicial review of the Secretary's decision and for declaratory judgment, naming as defendants both the Secretary and the chief petitioners. Plaintiff moved for summary judgment. So did the Secretary. The trial court denied plaintiff's motion, allowed the Secretary's motion, and entered judgment dismissing plaintiff's complaint. Plaintiff appeals, challenging the trial court's denial of her motion for summary judgment and the allowance of the Secretary's motion.

On appeal, plaintiff argues that Measure 2000-15 contains more than one amendment. According to plaintiff,

under Article XVII, section 1, as construed by the Oregon Supreme Court in *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998), a measure contains more than one amendment if it would make two or more substantive changes to the constitution that are not "closely related." In this case, plaintiff argues, Measure 2000-15 clearly makes more than two substantive changes to the constitution; the only question is whether those changes are "closely related." Plaintiff argues that the multiple changes to the constitution that would be effected by enactment of Measure 2000-15 are not closely related, because they affect so many different rights and powers of so many different persons and government entities.

■      The Secretary agrees that the enactment of Measure 2000-15 would make more than two substantive changes to the constitution, but he asserts that those changes are, at least "arguably," closely related. According to the Secretary, all of the changes that would result from enactment of Measure 2000-15 concern changes in methods of raising revenue and how those changes in the methods of raising revenue affect spending.

Article XVII, section 1, provides, in part:

> "When two or more amendments shall be submitted * * * to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

In *Armatta*, the Supreme Court examined in detail the language and history leading to the enactment of Article XVII, section 1, and, on the basis of that examination, established a test for determining whether a given measure contains more than one amendment.

> "We conclude that the proper inquiry is to determine whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related. If the proposal would effect two or more changes that are substantive and not closely related, the proposal violates the separate-vote requirement * * *."

327 Or at 277. Thus, under *Armatta*, the test consists of three component questions: (1) Would the measure effect two or more "changes" to the constitution? (2) Are those changes

"substantive" in nature? And, (3) are those changes "closely related"?

The *Armatta* opinion did not explicitly provide any guidance as to the meaning of the quoted terms in each of the three questions. Nevertheless, from the court's extended discussion of the language and history of Article XVII, section 1, as well as from its actual application of the three-fold inquiry in that case, we may derive several corollary principles that inform our application of the test in this case.

■ First, as to the focus of the first question, concerning "changes" to the constitution, we note that the court's focus is not on the form of the amendment itself, but rather on the effect its enactment would have on the Oregon Constitution. The court made that much clear in *Armatta* in its careful examination of the text:

> "Although Article XVII, section 1, does not define what is meant by 'two or more amendments,' it is important to note that the text focuses upon the potential *change* to the existing constitution, by requiring that two or more *constitutional amendments* be voted upon separately."

*Id.* at 263 (emphasis in original). The court further emphasized the point in drawing a distinction between what it termed the "separate-vote" requirement of Article XVII, section 1, and the "single-subject" requirement of Article IV, section 1(2)(d). The court held that, while the focus of single-subject analysis is exclusively the form of the proposed amendment itself, the focus of separate-vote analysis includes the nature of the proposed change to the existing constitution. *Id.* at 274. Finally, the point is perhaps most clearly established by the manner in which the court applied its analysis to the enactment at issue in that case. In *Armatta*, the court addressed whether Ballot Measure 40 (1996), a "crime victims' rights" initiative that was approved by the voters in the 1996 general election, violated Article XVII, section 1. In concluding that Measure 40 did, in fact, contain more than one amendment, the court focused exclusively on the effect that the enactment of the measure had on the existing constitution. *Id.* at 283-84.

■ Second, concerning the "substantive" nature of the proposed changes, we assume that the court intended to exclude merely formal changes involving, for example, changes to numbering, modernization of spelling, and the like. We also infer from the *Armatta* decision that the proposed changes must be real, rather than merely possible or speculative in nature. We note that, in its analysis of Measure 40, the Supreme Court limited its focus to those changes that Measure 40 actually and necessarily accomplished and did not mention others that the parties had suggested as merely possible effects of the enactment of the measure.

Third, as to how "closely related" the changes must be, although the court provided no precise formula for determining how "close" is "close enough," we derive helpful insights from the purpose of the separate-vote requirement and the manner in which the court actually applied the test in *Armatta*. The purpose of Article XVII, section 1, the court stated, is to "ensure that voters will not be compelled to vote upon multiple * * * constitutional changes in a single vote." *Id.* at 275. The court noted that the same concern is implicated by the single-subject requirement of Article IV, section 1(2)(d). That concern, often known as "log-rolling," is that voters not be compelled to accept one provision simply because it happens to have been packaged with another. Voters should have the opportunity to pick and choose among proposed amendments on their respective merits. The traditional explanation for antipathy to log-rolling is that it is antimajoritarian. Individual amendments should not be adopted unless supported by a majority—or, as the case may be, a supermajority—of the people. To force the people to accept a provision that otherwise would not draw the required voter support by tying it to an unrelated amendment that might draw sufficient support conflicts with that basic principle. *See generally* Millard H. Rudd, *"No Law Shall Embrace More than One Subject,"* 42 Minn L Rev 389, 448 (1958).

The court was quick to caution that, while the two requirements may have similar purposes, they are not identical in effect. In particular, the court noted that the separate-vote requirement applies only to constitutional amendments, while the single-subject rule applies to both constitutional amendments and legislation:

"It follows, we believe, that the separate-vote requirement of Article XVII, section 1, imposes a *narrower* requirement than does the single-subject requirement of Article IV, section 1(2)(d)."

*Id.* at 276 (emphasis in original). That is an important point, because it is well-established that the courts tend to be fairly generous in ascertaining the extent to which the provisions of a statute are embraced by a single subject. The court in *Armatta* made clear that the separate-vote requirement, in contrast to the single-subject requirement, is intended to have teeth.

■　　　That does not mean that every single change to the constitution must be separately stated. Two or more changes may be such that a vote in favor of one necessarily implies a vote in favor of the other. An amendment that affirmatively creates a constitutional right necessarily alters the scope of the legislative power under Article IV, section 1, for example. In such cases, the danger of log-rolling does not exist. But if a vote in favor of one amendment does not necessarily imply a vote in favor of another, the danger of log-rolling is clearly present, and, as we read *Armatta*, such changes could not properly be considered "closely related" under Article XVII, section 1.

The court's application of those principles in *Armatta* bears out the point. In concluding that the changes to the constitution occasioned by the enactment of Measure 40 were "not closely related," the court observed that Measure 40 altered existing constitutional provisions concerning searches and seizures, the right of defendants to have a unanimous verdict in a murder case, the right of a defendant to bail, and the qualification of jurors in a criminal case:

"[T]he right of all people to be free from unreasonable searches and seizures under Article I, section 9, has virtually nothing to do with the right of the criminally accused to have a unanimous verdict rendered in a murder case under Article I, section 11. The two provisions involve separate constitutional rights, granted to different groups of persons. Similarly, the right of the criminally accused to bail by sufficient sureties under Article I, section 14, bears no relation to legislation concerning the qualification of jurors in criminal cases under Article VII (Amended), section

5(1)(a). Those examples alone are sufficient to demonstrate that Measure 40 contains 'two or more amendments' to the Oregon Constitution."

*Id.* at 283-84. Certainly, the four changes the court mentioned were related in the sense that each concerned criminal procedure. But the court was not satisfied with such an approach, more familiar to single-subject analysis.

■ With the foregoing principles in mind, we turn to the application of the *Armatta* test to Measure 2000-15. We begin with whether the measure effects two or more changes to the constitution. Although the parties disagree about the precise nature and extent of the changes that would occur upon enactment of the measure, all agree that those changes would be multiple. We agree.

If enacted, Measure 2000-15 would require at least several changes to the Oregon Constitution. Existing Article IX, section 6, for example, requires the legislature to levy taxes to eliminate deficits. The enactment of Measure 2000-15 effectively would repeal that legislative authority. Similarly, Article XI, sections 1(c), 11(3)(c)(A), and 11(4)(a)(A), authorize the legislature, local taxing districts, and school districts respectively to enact ad valorem property taxes in certain circumstances. That authority, too, would be repealed by the enactment of Measure 2000-15. Existing Article XI, section 10, authorizes counties to incur certain bonded indebtedness. That section would be repealed by section 9 of Measure 2000-15, which would remove from any government authority the power to incur bonded indebtedness. Existing Articles XI-A and XI-D through XI-J similarly authorize the legislature to incur bonded indebtedness for certain purposes. That authority, too, would be repealed by the enactment of Measure 2000-15. Existing Article VIII, section 4, provides for the distribution of the income of the common school fund in proportion to the number of school children that live in each county. Enactment of Measure 2000-15 would alter that formula for distribution of common school fund income. We therefore conclude that the enactment of Measure 2000-15 would effect two or more changes to the constitution.

■     We turn to whether those changes would be "substantive" in nature. The parties agree that the foregoing changes are plainly substantive, and we agree. None of the changes that we have identified is merely formal. None is merely speculative. Each would alter the existing constitution in a substantial, significant way.

■     There remains the question whether the multiple changes to the constitution that would be produced by the enactment of Measure 2000-15 are "closely related." Plaintiff argues that they are not, because they involve altering the rights and duties of so many different persons and government authorities. The Secretary argues that we should take a broader, more lenient approach to determining whether proposed constitutional changes are "closely related." In that regard, the Secretary argues that the changes that the enactment of Measure 2000-15 necessarily would require are, in the Secretary's words, "at least arguably" related in the sense that they all concern government's ability to raise revenue, either through taxation or bonded indebtedness, and government's ability to spend that revenue.

■     We conclude that the changes that would be required by the enactment of Measure 2000-15 are not closely related. The Secretary's proposed rationale for grouping all of the changes under a general theme of government revenue raising and spending is precisely the sort of single-subject argument that the court in *Armatta* said would not suffice under Article XVII, section 1. The changes are to be *closely*, not merely plausibly, related.

As we have noted, the enactment of Measure 2000-15 effectively would, subject to certain exceptions, repeal the authority of state and local governments to raise revenues except by means of the gross receipts tax. It would also effect the extent to which the people, in the exercise of their initiative power, could alter the nature of the tax. It would likewise alter the manner in which common school funds may be distributed to counties. And it would eliminate the authority of state and local governments to incur bonded indebtedness. Those effects are not "closely related." A vote in favor of repealing the authority of state and local government to raise revenues except by means of a gross receipts tax does not, by

any stretch of the imagination, necessarily imply a favorable vote on the alteration of the authority of the people to enact changes to the nature of the tax. Nor does a vote in favor of either of those changes necessarily imply a favorable vote on the manner in which common school funds are distributed or on the extent to which state and local governments may incur bonded indebtedness. The grouping of those changes into one measure clearly implicates the log-rolling concerns that weighed so heavily in the Supreme Court's analysis in *Armatta*. Those examples alone are sufficient to establish that the enactment of Measure 2000-15 would effect more than two substantive changes that are not closely related.

We therefore conclude that the trial court erred in denying plaintiff's summary judgment motion and instead granting the Secretary's motion and dismissing the complaint.

Reversed and remanded for entry of judgment declaring that Measure 2000-15 violates Article XVII, section 1, and reversing the Secretary's decision approving the form of Measure 2000-15.