Argued and submitted November 6, 2001, judgment of circuit court affirmed
January 11, 2002

Mike LEHMAN,
Bill Markham, Ronald K. Culbertson,
and Giles E. Parker,
*Plaintiffs-Respondents,*

*v.*

Bill BRADBURY,
Secretary of State
for the State of Oregon,
*Defendant-Appellant,*

*and*

Frank EIZENZIMMER,
Oregonians for Fair Term Limits,
and U.S. Term Limits,
*Intervenors-Appellants.*

(CC 01C-14353; SC S48771)

37 P3d 989

Mary H. Williams, Assistant Attorney General, Salem, argued the cause and filed the briefs for defendant-appellant. With her on the briefs were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Kelly W. G. Clark, of O'Donnell & Clark, LLP, Portland, argued the cause for intervenors-appellants. With him on the briefs were Ross Day and Eric Winters, Portland.

Charles F. Hinkle, of Stoel Rives LLP, Portland, argued the cause and filed the brief for plaintiffs-respondents.

GILLETTE, J.

## GILLETTE, J.

Plaintiffs brought this action under the Uniform Declaratory Judgments Act, ORS 28.010 *et seq.*, and ORS 246.910(1),[1] challenging the constitutionality of Ballot Measure 3 (1992) (Measure 3 or "Term Limits Initiative").[2] Among other things, Measure 3 added to Article II of the Oregon Constitution section 19 (setting limits on the terms for most statewide political officeholders and for state legislators) and section 20 (setting limits on the terms of Oregon members of the United States House of Representatives and the United States Senate). Plaintiffs argued that Measure 3 contains two or more constitutional amendments that should have been voted on separately under Article XVII, section 1, of the Oregon Constitution.[3] The circuit court entered summary judgment for plaintiffs and declared Measure 3 "null, void, and unenforceable." For the reasons that follow, we affirm the judgment of the circuit court.

Plaintiffs are two former state representatives and two voters, one from each of the former representatives' districts. The former representatives filed declarations of candidacy for the office of State Representative for the 2003 legislative session, but defendant Secretary of State rejected those declarations, because each representative already had served the maximum term that he was permitted to serve under Measure 3. After the trial court declared Measure 3 invalid, defendant and intervenors[4] appealed to this court directly under Oregon Laws 2001, chapter 145, section 3(5).[5]

---

[1] ORS 246.910(1) provides, in part:

"A person adversely affected by any act or failure to act by the Secretary of State * * * may appeal therefrom to the circuit court for the county in which the act or failure to act occurred * * *."

[2] The pertinent part of the text of Measure 3 is set out below, 333 Or at 234-35.

[3] Article XVII, section 1, provides, in part:

"When two or more amendments [to the Oregon Constitution] shall be submitted * * * to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

Plaintiffs do not challenge Measure 3 on any ground other than the alleged deficiency of the measure under Article XVII, section 1.

[4] Intervenors are the chief petitioner for Measure 3 and two organizations that supported it.

[5] Oregon Laws 2001, chapter 145 (created by HB 2674), provides, in part:

The voters adopted Measure 3 in November 1992. Measure 3 provides, in part:

## "AN ACT

"Be It Enacted by the People of the State of Oregon:

"PARAGRAPH 1.   TERM LIMITS.   The Constitution of the State of Oregon is amended by creating new Sections 19 and 20 in Article II, to read:

"SECTION 19.   Limits on Oregon Terms. To promote varied representation, to broaden the opportunities for public service, and to make the electoral process fairer by reducing the power of incumbency, terms in Oregon elected offices are limited as follows:

"(1)   No person shall serve more than six years in the Oregon House of Representatives, eight years in the Oregon Senate, and twelve years in the Oregon Legislative Assembly in his or her lifetime.

"(2)   No person shall serve more than eight years in each Oregon statewide office in his or her lifetime.

"(3)   Only terms of service beginning after this Act goes into effect shall count towards the limits of this Section.

"(4)   When a person is appointed or elected to fill a vacancy in office, then such service shall be counted as one term for the purposes of this Section.

"(5)   A person shall not appear on the ballot as a candidate for elected office or be appointed to fill a vacancy in office if serving a full term in such office would cause them to violate the limits in this Section.

"(6)   This Section does not apply to judicial offices.

---

"Section 3. (1) If a candidate for state office files a * * * declaration of candidacy * * * and the * * * declaration * * * is rejected by the Secretary of State based on the provisions of section 19, Article II of the Oregon Constitution, the candidate may file an action that challenges the constitutionality or validity of sections 19, 20 and 21, Article II of the Oregon Constitution. The action must be commenced in the Circuit Court for Marion County.

"* * * * *

"(5) If a judgment in an action subject to the requirements of this section holds that any part of sections 19, 20 and 21, Article II of the Oregon Constitution, is unconstitutional or invalid in whole or in part, a party to the action may appeal the judgment only by filing a notice of appeal directly with the Supreme Court within the time and in the manner specified * * *."

"SECTION 20. Limits on Congressional Terms. To promote varied representation, to broaden the opportunities for public service, and to make the electoral process fairer by reducing the power of incumbency, terms in the United States Congress representing Oregon are limited as follows:

"(1)   No person shall represent Oregon for more than six years in the U.S. House of Representatives and twelve years in the U.S. Senate in his or her lifetime.

"(2)   Only terms of service beginning after this Act goes into effect shall count towards the limits of this Section.

"(3)   When a person is appointed or elected to fill a vacancy in office, then such service shall be counted as one term for the purposes of this Section.

"(4)   A person shall not appear on the ballot as a candidate for elected office or be appointed to fill a vacancy in office if serving a full term in such office would cause them to violate the limits in this section."

Under a decision of the Supreme Court of the United States rendered after the adoption of Measure 3, section 20 of Measure 3 is not valid under the United States Constitution. *See U.S. Term Limits, Inc. v. Thornton*, 514 US 779, 115 S Ct 1842, 131 L Ed 2d 881 (1995) (states may not impose qualifications for federal congressional offices in addition to those set out in United States Constitution). As we shall explain, the fact that section 20 violates the United States Constitution plays no role in our analysis concerning whether its presence in Measure 3 causes that measure to violate Article XVII, section 1, of the Oregon Constitution.

Plaintiffs argue that Measure 3 presented the voters, in a single "package," an amendment respecting limits on the terms of members of Oregon's congressional delegation. Plaintiffs contend that that "package" amended, either explicitly or implicitly the following provisions of the Oregon Constitution:

(1)   Explicitly, Article II, relating to suffrage and elections;

(2)   Implicitly, Article IV, section 8, relating to the qualifications for state legislators;

(3) Implicitly, Article V, section 1, relating to the qualifications for Governor; and

(4) Implicitly, Article VI, section 1, relating to the qualifications for Secretary of State and State Treasurer. Plaintiffs further argue that those amendments were substantive changes to the Oregon Constitution that were not "closely related" and, thus, that Measure 3 denied the voters the opportunity to vote separately on each unrelated substantive change, in violation of Article XVII, section 1, as this court interpreted that section in *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998).

In the trial court, defendant and intervenors conceded that Measure 3 made two or more substantive changes to the Oregon Constitution, but argued that those changes were "closely related" and, therefore, that the measure did not violate the "separate-vote" requirement of Article XVII, section 1. Defendant also asserted two defenses. First, he argued that plaintiff Markham's claim was precluded because Markham previously had challenged Measure 3 in federal court. Second, defendant argued that the claim of the two plaintiffs who are voters was barred by the doctrine of laches because those plaintiffs brought their claim nine years after the passage of Measure 3, during which time the people of the State of Oregon had come to rely on the validity of that measure. Defendant conceded in the trial court that plaintiff Lehman's claim was timely, while intervenors argued that the doctrine of laches barred the challenge of all four plaintiffs.

On appeal, defendant and intervenors make different arguments concerning plaintiffs' alleged delay in bringing this challenge to Measure 3. Defendant argues that this court should exercise its discretion not to consider plaintiffs' challenge—including the challenge of plaintiff Lehman—because too much time has elapsed since the passage of Measure 3.[6] Intervenors go further. They argue that challenges to the form in which initiated measures were adopted may be brought only within 30 days of the election at which

---

[6] Defendant abandoned his claim-preclusion argument respecting plaintiff Markham on appeal.

the voters approved the measure. We address intervenors' argument first.

■      Intervenors rely on Article IV, section 1, subsection (4), paragraph (d), of the Oregon Constitution. That paragraph provides:

> "[A]n initiative or referendum measure becomes effective 30 days after the day on which it is enacted or approved by a majority of the votes cast thereon."

Intervenors argue that any challenge to the validity of a measure must be brought by the effective date of the measure, as established by paragraph (d), or the measure thereafter is valid against the kind of constitutional challenge brought by plaintiffs here.

That argument need not detain us long. First, nothing in the text of paragraph (d) specifically states that, once a measure has gone into effect, the measure cannot be challenged on the ground that it was adopted in violation of constitutional requirements. Second, it is clear from the context in which paragraph (d) appears in Article IV, section 1(4), that paragraph (d) is a procedural provision that establishes only the date on which any measure—regardless of whether it is a constitutional amendment—becomes effective after a majority of the voters have approved it, nothing more. Like the other paragraphs in subsection (4) of Article IV, section 1, paragraph (d) addresses one step in the process by which initiatives and referenda become law. For example, paragraph (a) addresses the Secretary of State's verification of signatures on petitions; paragraph (b) requires that procedures set out in section 1 be followed in presenting any measure to the voters; and paragraph (c) provides that elections on measures are to be held at regular general elections. Intervenors' argument is not well taken. We turn to defendant's argument.

■      As noted, defendant does not seek to impose a specific deadline on those who seek to challenge initiated measures on form-of-adoption grounds; neither does he propose any specific window within which such a challenge must be brought. Instead, he argues that, in deciding whether to hear such a challenge, the court should consider "whether the challenges could have been raised earlier, the time that has

passed since enactment, and the amount and type of reliance placed on an assumption that the amendment was properly enacted." Under those criteria, defendant asserts, plaintiffs' challenge to Measure 3 on separate-vote grounds, brought nine years after the voters adopted it, comes too late.

Defendant is arguing that *this* court should exercise *its* "discretion" not to consider plaintiffs' claim. But, in so arguing, he does not appear to be suggesting that the direct appeal provision of Oregon Laws 2001, chapter 145, section 3(5), set out at 333 Or at 233-34 n 5, somehow provides for only discretionary review. Instead, we understand defendant's position to be that some challenges simply are made so long after the adoption of the measure to which they are directed that the challenges should not be entertained by *any* court. We therefore construe defendant's "discretion" argument as a contention that the *trial* court should not have assumed jurisdiction over this challenge, and we address it accordingly.

Respecting defendant's argument, we note that, as part of the same bill referred to above in which the legislature provided for direct review of challenges like plaintiffs', the legislature specifically authorized constitutional challenges to the Term Limits Initiative. The first paragraph of Oregon Laws 2001, chapter 145, section 3, provides:

"Section 3. (1) If a candidate for state office files a * * * declaration of candidacy * * * and the * * * declaration * * * is rejected by the Secretary of State based on the provisions of section 19, Article II of the Oregon Constitution, the candidate may file an action that challenges the constitutionality or validity of sections 19, 20 and 21, Article II of the Oregon Constitution. The action must be commenced in the Circuit Court for Marion County."

According to paragraphs (2) and (3) of section 3, the trial and appellate courts "shall have jurisdiction" over such a challenge if, like plaintiffs', that challenge is

"commenced within 30 days after the date the petition or declaration [of candidacy] is rejected by the Secretary of State and not later than the 250th day before the date of the biennial primary election."

That is, the legislature specifically authorized actions precisely like the one before us, but made no provision for any act of discretion by the trial court. It follows that the trial court had no authority to decline this case on discretionary grounds. Defendant's contrary argument is without support. We turn to the merits.

We begin by discussing the separate-vote requirement of Article XVII, section 1. As noted above, Article XVII, section 1, provides, in part:

"When two or more amendments shall be submitted * * * to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

This court explained the separate-vote requirement in *Armatta*, 327 Or 250, discussing and analyzing both the specific wording of the section and its historical development. This court held that the separate-vote requirement applies to constitutional amendments proposed by initiative, as well as to those proposed by the legislature. *Id.* at 261. Moreover, based on the text of the requirement, as well as on the historical circumstances surrounding its creation, this court concluded that the concept of a constitutional "amendment" meant "a particular constitutional change," *id.* at 266-67, and, thus, held that the separate-vote requirement requires that proposed amendments to the constitution be submitted to the voters in a manner that permits the voters to "express their will in one vote as to *only one constitutional change." Id.* at 269 (emphasis added). This court then stated the following test to determine whether a particular proposal to amend the constitution offends the separate-vote requirement:

"[T]he proper inquiry is to determine whether, if adopted, *the proposal would make two or more changes to the constitution that are substantive and that are not closely related*. If the proposal would effect two or more changes that are substantive and not closely related, the proposal violates the separate-vote requirement of Article XVII, section 1, because it would prevent the voters from expressing their opinions as to each proposed change separately."

*Id.* at 277 (emphasis added).

As a preliminary matter, we note that in the expression, "constitutional change," that this court used in *Armatta*

in describing Article XVII, section 1, as dealing with "a particular constitutional change" and as permitting "only one constitutional change," *id.* at 267, 269, the use of the adjective, "constitutional," illuminates an important distinction from this court's later use of the word "change," *id.* at 277, without a modifier. In the separate-vote test quoted above, this court's use of the word "changes" rather than the expression "constitutional changes" was a reference to "changes" in the ordinary sense, *i.e.*, to any alteration in the wording of the constitution. Although that distinction may be obvious, we emphasize it here because, in any separate-vote inquiry, it is imperative that we remain aware that any amendment to the constitution involves some change to the wording of that document. However, not every one-word change to the wording of the constitution is a separate "amendment." If it were, then amendments to the constitution would have to happen word-by-word, and the people's power to amend the constitution would be hamstrung.

On appeal, plaintiffs accept that the test from *Armatta*—whether a measure makes "two or more changes to the constitution that are substantive and are not closely related"—is the proper inquiry. However, in the trial court, plaintiffs relied on a decision of the Court of Appeals, *Dale v. Kiesling*, 167 Or App 394, 999 P2d 1229 (2000), in which that court characterized the separate-vote inquiry in a different way. Because the trial court relied on the Court of Appeals' interpretation of how to determine whether a proposed amendment offends Article XVII, section 1, we address *Dale* briefly here.

*Dale* concerned a pre-adoption challenge to proposed initiative Measure 15 (2000), which sought to create a "gross receipts" tax.[7] The Court of Appeals concluded that Measure 15 (2000), if adopted, would have made multiple, substantive changes to the constitution that were not closely related and, therefore, that the measure violated the separate-vote requirement of Article XVII, section 1. 167 Or App at 403-04.

---

[7] Measure 15 (2000) did not appear on the 2000 ballot, because petitioners failed to obtain a sufficient number of signatures. This court therefore dismissed the petition for review of the Court of Appeals' decision in *Dale* as moot. *Dale v. Bradbury*, 330 Or 567, 10 P3d 944 (2000).

The Court of Appeals stated that "the separate-vote requirement, in contrast to the single-subject requirement, is intended to have teeth." *Id.* at 401. The court then concluded that two or more substantive changes to the constitution did not meet the "closely related" test of *Armatta* "if a vote in favor of one amendment does not necessarily imply a vote in favor of another." *Id.* at 401. In the present case, the trial court applied the Court of Appeals' "necessary implication" test in holding that Measure 3 violated the separate-vote requirement of Article XVII, section 1. However, as we shall explain, the "necessary implication" test reflects a basic misunderstanding of the separate-vote requirement.

In *Armatta*, this court emphasized that Article IV, section 1(2)(d), and Article XVII, section 1, focus on different concerns:

> "[T]he single-subject requirement * * * focuses upon the *content* of a proposed law or amendment, by requiring that it embrace only one subject and matters properly connected therewith. * * *

> "The separate-vote requirement, by contrast, focuses upon the form of submission of an amendment, as well as the potential *change* to the existing constitution, by requiring that two or more *constitutional amendments* be voted upon separately. That is, in addition to speaking to the form of submission, the separate-vote requirement addresses the extent to which a proposed amendment would *modify* the existing constitution. That is significantly different from the wording of the single-subject requirement, which focuses in isolation upon only the text of a proposed amendment in requiring that it embrace a single subject."

*Id.* at 275-76 (emphasis in original; citations omitted).

■     The Court of Appeals' opinion in *Dale* fails to take into account that crucial difference between the single-subject requirement and the separate-vote requirement and, therefore, relies too heavily on their similarity. In particular, the Court of Appeals' summary of the separate-vote requirement as the single-subject requirement "with teeth" suggests, incorrectly, that the difference between the two requirements is only a matter of degree. As the foregoing quotations from *Armatta* demonstrate, however, the two

requirements differ in kind. Nothing in the text of the separate-vote requirement and nothing in this court's opinion in *Armatta* or in any other case applying Article XVII, section 1, requires that, for two or more constitutional changes permissibly to be made by one proposed amendment, a vote for one change must "necessarily imply" a vote for the other. The Court of Appeals erred in creating that unnecessarily restrictive application of the *Armatta* test.

We return to the separate-vote inquiry at issue here. As noted above, plaintiffs argue on appeal that the inquiry that we should conduct to determine whether Measure 3 violates the separate-vote requirement is the inquiry described in *Armatta*: We must determine whether Measure 3 proposed to the voters two or more changes to the constitution that were substantive and were not closely related. Defendant also agrees that the *Armatta* inquiry is the appropriate one to follow in this case, but he asks this court to announce a further test to explain what "closely related" means. He offers the following: "[T]wo or more changes to the constitution are 'closely related' if they are so logically interrelated as to present one specific, discrete, cohesive policy choice."

Defendant apparently believes that *Armatta* needs clarification. However, adopting defendant's "clarification" would mean that we potentially were permitting our task under Article XVII, section 1, to degenerate into an endless war of adjectives and adverbs, each battle of which would involve further efforts to explain and elaborate on whichever set of adjectives and adverbs had been used in the next preceding case. That does not mean that we would not accept a party's proposed reformulation of an existing analytical test, if it appeared that the proposed test would be a better tool to use in future cases. Defendant's proffered test simply does not appear to us to be a better tool.

We begin our separate-vote inquiry concerning Measure 3 by focusing on the changes that Measure 3 made to the Oregon Constitution. *See Armatta*, 327 Or at 278 (beginning inquiry concerning ballot measure by identifying changes that it would have made to existing constitution). As discussed earlier, by its terms, Measure 3 purported to

amend Article II of the Oregon Constitution, the article concerning suffrage and elections, by adding new sections to that article. Measure 3 did not expressly repeal or modify any existing constitutional provision. However, we look not only at the explicit changes but also at the implicit changes that a measure would make to the constitution, if any, to identify the changes that are relevant to our determination whether the proposed amendment offends the separate-vote requirement of Article XVII, section 1. *See Armatta*, 327 Or at 278 (identifying explicit and implicit changes).

Before Measure 3 was adopted, both Article II and Article IV of the Oregon Constitution described certain qualifications for state legislators. *See* Or Const, Art II, §§ 7 to 11; Or Const, Art IV, § 8 (both setting out qualifications). Article IV, section 4, set out the terms of office for legislators (four years for a senator, two years for a representative). Neither those provisions nor other provisions of the constitution limited the number of terms or years that individual legislators could serve. By adding Article II, section 19, to the constitution, Measure 3[8] changed the constitution in that regard, by limiting state legislative service to a lifetime maximum of six years in the Oregon House of Representatives, eight years in the Oregon Senate, and a total of 12 years in the Legislative Assembly.

Article II, section 19, made similar changes respecting elected members of the executive branch. Before Measure 3 was adopted, the Governor, Secretary of State, and State Treasurer were limited to serving eight years in office in any 12-year period. *See* Article V, section 1 (Governor); Article VI, section 1 (Secretary of State and State Treasurer). The addition of section 19 to Article II changed the constitution in that regard by limiting all persons who hold statewide office

---

[8] We refer to changes made by section 19 and changes made by section 20 only as shorthand references to the wording changes at issue in this case. The fact that the authors of Measure 3 saw fit to divide the state and federal components of their proposed measure into separate sections has no analytical significance.

We also note that it is not pertinent to our discussion that section 20 turned out to be a "dead letter," in that it is unenforceable due to a decision of the United States Supreme Court. However ineffective section 20 turned out to be in fact, it was a part of the amendment that was submitted to the voters with section 19 and, if the combination of those two sections offended Article XVII, section 1, it is of no moment that section 20 turned out to be unenforceable for some other reason.

(except judges) to eight years in any particular office over the course of a lifetime.

Finally, Measure 3—specifically, with the addition of Article II, section 20—also explicitly changed Article II by adding term limits for the members of the Oregon delegation to Congress.

Contrary to their argument in the trial court, intervenors argue on appeal that Measure 3 did not make more than one change to the Oregon Constitution because Measure 3 was a "cohesive combination of provisions" on a "discrete subject," *i.e.*, term limits. To the extent that intervenors are arguing that the multiple alterations ("changes") to the wording of the constitution nonetheless are only one *constitutional* change and, therefore, permissible under Article XVII, section 1, their argument ultimately fails for the reasons set forth below. We address that issue shortly. But, to the extent that intervenors are arguing that Measure 3 does not make multiple changes in the ordinary sense of multiple substantive alterations to existing wording, their argument is unsupportable. Changes in the term limits for state executive officers and the creation of such limits for state legislators and for members of Congress are at least two substantive changes to the constitution.

We turn to the remaining question under the *Armatta* test, *viz.*, whether those substantive changes to the constitution are "closely related." In *Armatta*, this court did not need to elaborate on its application of the "closely related" test to the substantive changes that had been made by the amendment at issue, Ballot Measure 40 (1996) (Measure 40). That was so because, once this court had described the multiple, substantive changes that Measure 40 made to the Oregon Constitution, their lack of "close relation" was obvious. Among other changes, Measure 40: (1) limited existing constitutional rights respecting searches and seizures, self-incrimination, and former jeopardy under Article I, sections 9 and 12, "by granting crime victims the right to have 'all relevant evidence admissible against the criminal defendant' "; (2) limited the right of a defendant in a murder case, under Article I, section 11, to a unanimous verdict by permitting convictions for murder based on a jury's 11-1 "guilty" vote;

and (3) limited the legislature's authority under Article VII (Amended), section 5(1)(a), to enact laws pertaining to juror qualifications by requiring that jurors in criminal cases be registered voters and not have been convicted of a felony within the previous 15 years. *Armatta*, 327 Or at 254, 283. Under those circumstances, this court was able to conclude, without extended discussion, that the changes made by Measure 40 were not "closely related" and, thus, that Measure 40 violated the separate-vote requirement of Article XVII, section 1. *Id.* at 283.

Armatta nevertheless provides some guidance for resolving the question in this case, *viz.*, whether the changes that Measure 3 made to the Oregon Constitution were closely related. First, this court analyzed the relationship among the constitutional provisions affected by Measure 40. This court noted that at least two affected constitutional provisions—Article I, section 9, and Article I, section 11—conferred rights that had "virtually nothing to do" with each other, *viz.*, the right of all people to be free from unreasonable searches and seizures and the right of the criminally accused to have a unanimous verdict rendered in a murder case. *Armatta*, 327 Or at 283. The court further distinguished those two constitutional provisions by the fact that each involves "separate constitutional rights, granted to different groups of persons." *Id.* For the voters to change such provisions in a substantive way, the court held, they must vote on the changes separately. *Id.* at 284. In that way, the separate vote requirement serves its purpose to safeguard the fundamental law. *Id.* at 276.

The court suggested in *Armatta* that Measure 40 had a second weakness, *viz.*, that the changes that it made to certain constitutional provisions were very different from one another. For example, one change made by Measure 40—adding to the Oregon Constitution the requirement that the jury pool in criminal cases be drawn from registered voters—did not "share [the] relationship" that bound certain other changes to each other. *Id.* at 283. In making that observation, the court, in effect, considered both the relationship among the constitutional provisions affected by Measure 40 and the relationship of the constitutional changes that were made in those provisions to one another.

■  As summarized above, *Armatta* highlights this court's analysis in determining whether a measure offends the separate-vote requirement of Article XVII, section 1. First, we examine the relationship among the constitutional provisions that the measure affects, both explicitly and implicitly. If the affected provisions of the existing constitution themselves are not related, then it is likely that changes to those provisions will offend the separate-vote requirement.[9] That conclusion makes sense, because it is difficult to make *related* changes to *unrelated* constitutional provisions. However, we decline to speculate whether the fact that a proposed amendment affects unrelated provisions of the constitution will be fatal in every case, because, in so doing, we might underestimate the ability of initiative petitioners to design careful, constitutionally sound amendments for the voters to consider. Nonetheless, the fact that a proposed amendment asks the people, in one vote, substantively to change multiple provisions of the Oregon Constitution that are not themselves related is one indication that the proposed amendment might violate the separate-vote requirement.

Next, we must consider the constitutional changes themselves. That is, assuming that the constitutional provisions affected by the measure are related, we must determine whether the changes made to those related constitutional provisions are closely related. If they are closely related, the measure under consideration survives scrutiny under Article XVII, section 1. If they are not, it does not.

Returning to Measure 3, we begin, as the court did in *Armatta*, by examining the relationship, if any, among the existing constitutional provisions affected by that measure, *viz.*, Article II, Article IV, section 8, Article V, section 1, and Article VI, section 1.

Plaintiffs first assert that the existing constitutional provisions concerning eligibility for state legislative office

---

[9] For example, as was true in *Armatta*, when the affected constitutional provisions confer separate rights on different groups of people, that is a strong indication that those provisions are not "related" for purposes of the separate-vote requirement.

(Article IV, section 8) and the constitutional provisions governing eligibility to be Governor (Article V, section 1), Secretary of State, and State Treasurer (both at Article VI, section 1), all of which are changed by section 19 of Measure 3, are not related, because they are independent of each other and are significantly different. The framers demonstrated that view, plaintiffs argue, by including a limitation in Articles V and VI on the terms that the Governor, Secretary of State, and State Treasurer could serve (no more than eight years out of 12), while they did not include a limitation on the terms that legislators could serve. Because the framers believed that term limits for state executive officers could exist independently of term limits for state legislators, plaintiffs reason that the constitutional provisions governing the eligibility for those elected officials are not related. Accordingly, they contend, this court need go no further in analyzing whether Measure 3 violates the separate-vote requirement of Article XVII, section 1.

Although we accept plaintiffs' argument that the framers of the constitution viewed the terms of state legislators differently from the terms of state executive officers, we disagree with plaintiffs' derivative theory. The framers' view that some constitutional officers' tenure needed to be circumscribed, but other officers' tenure did not need to be, is not dispositive of whether the constitutional wording respecting the tenure of each group of officers is related.

An examination of the text of Article II of the Oregon Constitution demonstrates why plaintiffs' theory about the lack of relationship among the constitutional provisions affected by the addition of section 19 is flawed. Article II, which addresses suffrage and elections generally, always has contained provisions respecting a wide variety of circumstances that could disqualify a person from holding state elective office. The various offices involved were in different branches of state government and had different responsibilities, but the terms for disqualification were identical. *See, e.g.,* Or Const, Art II, § 7 (every person who gives or offers bribe to procure office is disqualified from holding office); Or Const, Art II, § 9 (any person who gives or accepts challenge to fight duel is ineligible for any office of public trust or profit); Or Const, Art II, § 11 (no person who is a collector or

holder of public moneys shall be eligible for office until after accounting of monies for which that person is liable).[10] Those provisions of Article II demonstrate that the framers considered state legislators and state executive officeholders to be parts of a larger category, namely, persons holding elected office in the political branches of state government. Section 19 adds an additional disqualifying factor respecting state elective offices in those branches of Oregon government, *viz.*, term limits. It follows, we think, that the constitutional provisions affected by section 19 are related.

By ordinary progression, the next question that this court could address would be whether the *changes* made by section 19 to Article II, Article IV, section 8, Article V, section 1, and Article VI, section 1, of the Oregon Constitution, are "closely" related. Plaintiffs argue that they are not. We do not answer that question here, however, because, even assuming, *arguendo*, that all the changes made to the Oregon Constitution by section 19 are closely related—and therefore would make only one amendment to the Oregon Constitution under Article XVII, section 1—the further change to the Oregon Constitution made by section 20 of Measure 3 is different.

■        Plaintiffs argue that, because Measure 3 changed qualifications for holding *federal* elected office, in addition to the qualifications for holding *state* elected office, not all the changes that the measure made can be "closely" related. They state:

> "As a matter of law, a proposal to establish qualifications for officers of state government, which is a matter clearly within the power and jurisdiction of a state, is not 'closely related' to a proposal to establish qualifications for officers of the federal government, which is outside the power and jurisdiction of a state."

Recast in constitutional terms, we understand plaintiffs' argument to be that the substantive change to the Oregon Constitution made by the addition of a provision (section 20)

---

[10] We also note in passing that the recall power, found at Article II, section 18, extends to "[e]very public officer in Oregon," again reaching across separation-of-powers lines to sweep in the widest possible range of officials, including all elected ones. The recall power originally was adopted by the people by initiative in 1908.

that limits the terms of members of Congress is not closely related to the substantive changes that limit the terms of elected officials in the political branches of state government. As explained below, we agree.

Section 20 is similar to section 19 in that it, too, creates a term limit for an elected official. But stating the similarity in those terms focuses exclusively on the measure itself, not on changes that section 20 makes to the Oregon Constitution. When we consider section 20 in the context of the Oregon Constitution—as *Armatta* requires us to do—its lack of close relation to the substantive changes effected by section 19 is clear. Of greatest significance, section 20 adds to Article II a limitation on the term of federal officials elected in Oregon whose eligibility in other respects never was—and still, absent section 20, is not—addressed in the Oregon Constitution.

Before the addition of section 20, the Oregon Constitution had little to say about members of Congress. Article II, section 17, for example, specifies where electors must reside to qualify to vote for members of Congress, but it is silent about what qualifications members must possess or how many terms they are entitled to serve. The only other mention of congressional delegates in the Oregon Constitution is in Article XVIII, section 6, providing for election of a Representative in Congress and selection of two United States Senators as part of the organization of Oregon State Government. Those provisions reflect the Elections Clause of Article I, section 4, of the United States Constitution,[11] which had been in existence for 70 years before the ratification of the Oregon Constitution. Article I, section 4, of the United States Constitution, specifically delegates to the states the authority to prescribe the time, place, and manner of election of members of Congress from those states. Other provisions of the United States Constitution make clear that the eligibility

---

[11] The Elections Clause of Article I, section 4, of the United States Constitution, provides:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators."

of members of Congress would be determined by that constitution, not by the constitutions of each of the several states. Article I, section 2, of the United States Constitution, provides that members of the House of Representatives shall serve two-year terms. There is no limitation on how many terms a Representative may serve. Article I, section 3, of the United States Constitution, provides that members of the Senate shall serve six-year terms. There is no limitation on how many terms a Senator may serve.

When the people were asked in Measure 3 to add section 20 to Article II of the Oregon Constitution, they were asked to change the eligibility of members of Congress, a topic found nowhere else in the Oregon Constitution. The problem was not necessarily that the provision was new. Newness, in and of itself, may be a neutral factor. But the specific addition made by section 20, affecting eligibility for federal public office, had little or nothing to do with term limits for the Oregon State Treasurer, for example, as those limits were established in section 19. Nonetheless, the voters were asked to vote for or against both sections in a single measure. In terms of Article XVII, section 1, Measure 3 submitted two or more amendments to the voters in a manner that prevented the voters from voting on each amendment separately. That was impermissible.

As this court explained in *Armatta*, 327 Or at 284, a proposed constitutional amendment must be adopted in compliance with constitutional requirements:

> "It is a long-standing principle of law that a proposed constitutional amendment must be adopted in compliance with the procedures set forth in the Oregon Constitution:
>
> > " 'The provisions of the constitution for its own amendment are mandatory, and must be strictly observed. *A failure in this respect will be fatal to a proposed amendment, notwithstanding it may have been submitted to and ratified and approved by the people.* The constitutional provisions are as binding upon the people as upon the legislative assembly, and the people cannot give legal effect to an amendment which was submitted in disregard of the limitations imposed by the constitution.' "

*Id.* at 284 (quoting *Kadderly v. Portland*, 44 Or 118, 135-36, 74 P 710 (1903) (*on reh'g* 75 P 22 (1904)) (emphasis in *Armatta*). Accordingly, because Measure 3 was not adopted in compliance with the requirements of Article XVII, section 1, we hold that it is void in its entirety.

The judgment of the circuit court is affirmed.