Argued and submitted November 4, 2004, decision of Court of Appeals reversed; judgment of circuit court affirmed October 19, 2006

LINCOLN INTERAGENCY NARCOTICS TEAM (LINT),
a law enforcement agency
created by intergovernmental agreement,
*Respondent on Review,*

*and*

LINCOLN COUNTY,
a political subdivision of the State of Oregon,
*Plaintiff,*

*and*

ANIMAL LEGAL DEFENSE FUND,
Oregon Humane Society,
Humane Society of the Willamette Valley,
Stephan K. Otto, Sharon M. Harmon
and Wayne S. Geiger,
*Respondents on Review,*

*v.*

John KITZHABER, M.D.,
Governor of the State of Oregon,
Bill Bradbury,
Oregon Secretary of State,
and the State of Oregon,
*Petitioners on Review,*

*and*

Ray HESLEP
and Sandra Adamson,
*Petitioners on Review.*

(CC 00C-19878; CA A115401; SC S50900 (control), S50904)
(Consolidated for Argument and Opinion)

145 P3d 151

Philip Schradle, Special Counsel to the Attorney General, Salem, argued the cause and filed the briefs for petitioners on review John Kitzhaber, M.D., Bill Bradbury and State of Oregon. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Eli D. Stutsman, Portland, argued the cause and filed the brief for petitioners on review Ray Heslep and Sandra Adamson.

Robert E. Bovett, Newport, argued the cause and filed the brief for respondent on review LINT.

B. Carlton Grew, Portland, filed the brief for respondents on review Animal Legal Defense Fund, Oregon Humane Society, Humane Society of the Willamette Valley, Stephan K. Otto, Sharon M. Harmon, and Wayne S. Geiger.

Before Carson, Chief Justice,** and Gillette, Durham, De Muniz,*** Balmer, and Kistler, Justices, and Riggs, Justice pro tempore.****

GILLETTE, J.

Durham, J., specially concurred and filed an opinion.

Kistler, J., dissented and filed an opinion in which De Muniz, C. J., and Balmer, J., joined.

---

** Chief Justice when case was argued.

*** Chief Justice when decision was rendered.

**** The Honorable R. William Riggs, Senior Judge, sitting by designation. Walters, J., did not participate in the consideration or decision of this case.

## GILLETTE, J.

The issue in this case is whether Ballot Measure 3 (2000) (Measure 3), a constitutional amendment that the people adopted pursuant to the initiative process, actually contains two or more constitutional amendments in violation of Article XVII, section 1, of the Oregon Constitution.[1] A divided panel of the Court of Appeals held that the measure does contain two or more amendments because it makes at least two substantive changes to the constitution that are not closely related. *Lincoln Interagency Narcotics Team v. Kitzhaber*, 188 Or 526, 72 P3d 967 (2003). For the reasons that follow, we disagree with that conclusion and therefore reverse the decision of the Court of Appeals.

The voters adopted Measure 3 at the November 7, 2000, general election. The measure adds a new section dealing with forfeitures to Article XV of the Oregon Constitution. Measure 3 provides:

"Article XV of the Constitution of the State of Oregon is amended by a vote of the People to include the following new section:

"*Section 10. The Oregon Property Protection Act of 2000.* (1) This section may be known and shall be cited as the 'Oregon Property Protection Act of 2000.'

"(2) *Statement of principles.* The People, in the exercise of the power reserved to them under the Constitution of the State of Oregon, declare that:

"(a)   A basic tenet of a democratic society is that a person is presumed innocent and should not be punished until proven guilty;

"(b)   The property of a person should not be forfeited in a forfeiture proceeding by government unless and until that person is convicted of a crime involving the property;

---

[1] Article XVII, section 1, of the Oregon Constitution provides:

"When two or more amendments shall be submitted * * * to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

"(c)  The value of property forfeited should be proportional to the specific conduct for which the owner of the property has been convicted; and

"(d)  Proceeds from forfeited property should be used for treatment of drug abuse unless otherwise specified by law for another purpose.

"(3)  *Forfeitures prohibited without conviction.* No judgment of forfeiture of property in a civil forfeiture proceeding by the State or any of its political subdivisions shall be allowed or entered until and unless the owner of the property is convicted of a crime in Oregon or another jurisdiction and the property is found by clear and convincing evidence to have been instrumental in committing or facilitating the crime or to be proceeds of that crime. The value of the property forfeited under the provisions of this subsection shall not be excessive and shall be substantially proportional to the specific conduct for which the owner of the property has been convicted. For purposes of this section, 'property' means any interest in anything of value, including the whole of any lot or tract of land and tangible and intangible personal property, including currency, instruments or securities or any other kind of privilege, interest, claim or right whether due or to become due. Nothing in this section shall prohibit a person from voluntarily giving a judgment of forfeiture.

"(4)  *Protection of innocent property owners.* In a civil forfeiture proceeding if a financial institution claiming an interest in the property demonstrates that it holds an interest, its interest shall not be subject to forfeiture.

"In a civil forfeiture proceeding if a person claiming an interest in the property, other than a financial institution or a defendant who has been charged with or convicted of a crime involving that property, demonstrates that the person has an interest in the property, that person's interest shall not be subject to forfeiture unless:

"(a)  The forfeiting agency proves by clear and convincing evidence that the person took the property or the interest with the intent to defeat the forfeiture; or

"(b)  A conviction under subsection (3) is later obtained against the person.

"(5)  *Exception for unclaimed property and contraband.* Notwithstanding the provisions of subsection (3) of this section, if, following notice to all persons known to have an interest or who may have an interest, no person claims an interest in the seized property or if the property is contraband, a judgment of forfeiture may be allowed and entered without a criminal conviction. For purposes of this subsection, 'contraband' means personal property, articles or things, including but not limited to controlled substances or drug paraphernalia, that a person is prohibited by Oregon statute or local ordinance from producing, obtaining or possessing.

"(6)  *Law enforcement seizures unaffected.* Nothing in this section shall be construed to affect the temporary seizure of property for evidentiary, forfeiture, or protective purposes, or to alter the power of the Governor to remit fines or forfeitures under Article V, Section 14, of this Constitution.

"(7)  *Disposition of property and proceeds to drug treatment.* Any sale of forfeited property shall be conducted in a commercially reasonable manner. Property or proceeds forfeited under subsections (3), (5), or (8) of this section shall not be used for law enforcement purposes but shall be distributed or applied in the following order:

"(a)  To the satisfaction of any foreclosed liens, security interests and contracts in the order of their priority;

"(b)  To the State or any of its political subdivisions for actual and reasonable expenses related to the costs of the forfeiture proceeding, including attorney fees, storage, maintenance, management, and disposition of the property incurred in connection with the sale of any forfeited property in an amount not to exceed twenty-five percent of the total proceeds in any single forfeiture;

"(c)  To the State or any of its political subdivisions to be used exclusively for drug treatment, unless another disposition is specially provided by law.

"(8)  *State and federal sharing.* The State of Oregon or any of its political subdivisions shall take all necessary steps to obtain shared property or proceeds from the United States Department of Justice resulting from a forfeiture.

Any property or proceeds received from the United States Department of Justice by the State of Oregon or any of its political subdivisions shall be applied as provided in subsection (7) of this section.

"(9)   *Restrictions on State transfers.* Neither the State of Oregon, its political subdivisions, nor any forfeiting agency shall transfer forfeiture proceedings to the federal government unless a state court has affirmatively found that:

"(a)   The activity giving rise to the forfeiture is interstate in nature and sufficiently complex to justify the transfer;

"(b)   The seized property may only be forfeited under federal law; or

"(c)   Pursuing forfeiture under state law would unduly burden the state forfeiting agencies.

"(10)   *Penalty for violations.* Any person acting under color of law, official title or position who takes any action intending to conceal, transfer, withhold, retain, divert or otherwise prevent any proceeds, conveyances, real property, or any things of value forfeited under the law of this State or the United States from being applied, deposited or used in accordance with subsections (7), (8) or (9) of this section shall be subject to a civil penalty in an amount treble the value of the forfeited property concealed, transferred, withheld, retained or diverted. Nothing in this subsection shall be construed to impair judicial immunity if otherwise applicable.

"(11)   *Reporting requirement.* All forfeiting agencies shall report the nature and disposition of all property and proceeds seized for forfeiture or forfeited to a State asset forfeiture oversight committee that is independent of any forfeiting agency. The asset forfeiture oversight committee shall generate and make available to the public an annual report of the information collected. The asset forfeiture oversight committee shall also make recommendations to ensure that asset forfeiture proceedings are handled in a manner that is fair to innocent property owners and interest holders.

"(12) *Severability.* If any part of this section or its application to any person or circumstance is held to be invalid for any reason, then the remaining parts or applications to any persons or circumstances shall not be affected but shall remain in full force and effect."

(Emphasis in original.)

Measure 3 follows the unfortunate practice, sometimes questioned, of inserting provisions in the state constitution that have more in common, both in appearance and in substance, with legislation than with constitutional amendments. *See Olsen v. State ex rel Johnson,* 276 Or 9, 19, 554 P2d 139 (1976) (recognizing practice). The measure begins, for example, by stating that it "may be known and shall be cited as the 'Oregon Property Protection Act of 2000' "—a designation more typically associated with legislation than with constitutional amendments.[2] *See Christ/Tauman v. Myers,* 339 Or 494, 499, 123 P3d 271 (2005) (explaining that "[a]cts are different from constitutional amendments"). The fact that Measure 3 adds almost two pages of provisions dealing with forfeitures to a single section of the Oregon Constitution is consistent with that designation. The measure imposes various procedural and substantive limitations on forfeiture proceedings, establishes priorities for and limitations on the distribution of forfeiture proceeds (including proceeds from federal forfeiture proceedings that are available to the state), creates a state agency to monitor and report on forfeitures, and provides a civil penalty for violating its provisions.

After the people adopted Measure 3, plaintiffs Lincoln Interagency Narcotics Team (LINT) and Lincoln County filed a declaratory judgment action against the Governor, the Secretary of State, and the State of Oregon (collectively "the state"), seeking a declaration that the measure contained two or more amendments in violation of Article XVII, section 1. Alternatively, plaintiffs sought a declaration that Measure 3 embraced more than one subject, in violation

---

[2] And, that provision notwithstanding, we shall continue to refer to the measure as "Measure 3" throughout this opinion.

of Article IV, section 1(2)(d), of the Oregon Constitution.[3] The chief petitioners of Measure 3 (interveners) intervened in defense of the measure.[4] On cross-motions for summary judgment, the trial court ruled that Measure 3 contained only one amendment to the constitution and embraced only a single subject, and entered judgment accordingly.

Plaintiff LINT appealed, and a divided panel of the Court of Appeals reversed. The majority concluded that, under the analysis in *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998), subsections (3) and (7) of Measure 3 made two substantive changes to the constitution that were not closely related. *Lincoln Interagency Narcotics Team*, 188 Or App at 538-43, 546-48.

Judge Armstrong dissented. In his view, the majority's decision failed to give effect to this court's decisions in *Baum v. Newbry et al.*, 200 Or 576, 267 P2d 220 (1954), and *Hartung v. Bradbury*, 332 Or 570, 33 P3d 972 (2001). The dissent reasoned that the changes that Measure 3 made to the Oregon Constitution were as closely related as the changes that the court upheld in *Baum* and that they were the type of changes that "would commonly be placed in a single section of the constitution." *Id.* at 570 (Armstrong, J., dissenting). It followed, the dissent concluded, that Measure 3 did not contain two or more amendments to the constitution. *Id.* We allowed the state's petition for review to consider this recurring issue.

As noted, Article XVII, section 1, of the Oregon Constitution provides that, "[w]hen two or more amendments shall be submitted in the manner aforesaid to the voters of this state at the same election, they shall be submitted so that each amendment shall be voted on separately." In *Armatta*, this court undertook, for the first time, a comprehensive examination of the meaning of that separate-vote requirement.[5] Following the methodology in *Priest v. Pearce*,

---

[3] Article IV, section 1(2)(d), of the Oregon Constitution provides, in part:

"* * * A proposed * * * amendment to the Constitution shall embrace one subject only and matters properly connected therewith."

[4] Various organizations and individuals also intervened as plaintiffs. Because their arguments essentially track plaintiffs' arguments, we do not refer to those interveners separately.

[5] Before *Armatta*, this court had applied the separate-vote requirement without considering either the wording of the requirement or its history. *See Baum*, 200

314 Or 411, 840 P2d 65 (1992), the court considered the wording of Article XVII, section 1, its history, and the cases interpreting it. *See Armatta*, 327 Or at 256-77 (undertaking that analysis). The court drew three conclusions from those sources. First, looking primarily to the debates on the Indiana Constitution, the court concluded that the word "amendment" refers to a specific or particular change to the constitution. *Id.* at 265-66; *see also Lehman v. Bradbury*, 333 Or 231, 239, 37 P3d 989 (2002) (drawing that conclusion from *Armatta*). Citing historical examples, the court observed that "a single 'amendment,' such as one concerning the establishment of a state bank or the rights of married women, was intended to encompass a particular constitutional change." *Armatta*, 327 Or at 265-66.

Second, the court concluded that the separate-vote requirement for initiated laws and constitutional amendments imposes a more restrictive test than the single-subject requirement set out in Article IV, section 1(2)(d), of the Oregon Constitution. *Id.* at 276. The court noted that the single-subject requirement focuses on the content of a proposed law or amendment, while the separate-vote requirement focuses on the "potential *change* to the existing constitution" and the degree to which "a proposed amendment would *modify* the existing constitution." *Id.* (emphases in original). More significantly, the court explained that

> "the separate-vote requirement applies to *only* constitutional amendments, while the single-subject requirement applies equally to constitutional amendments *and* legislation. It follows, we believe, that the separate-vote requirement of Article XVII, section 1, imposes a *narrower* requirement than does the single-subject requirement of Article IV, section 1(2)(d). Such a reading of the separate-vote requirement makes sense, because the act of amending the *constitution* is significantly different from enacting or amending *legislation*. * * * Indeed, because the separate-vote requirement is concerned *only* with a change to the fundamental law, the notion that the people should be able to vote separately upon each separate amendment should come as no surprise. In short, the requirement serves as a

Or at 580-81 (stating, without explanation, that a 1952 constitutional amendment "did not submit 'two or more amendments' to the voters" in violation of Article XVII, section 1).

safeguard that is fundamental to the concept of a constitution."

*Id.* (emphases in original; citation omitted).

Third (and most important to the task we face in this case), the court recognized that, although the separate-vote requirement is more restrictive than the single-subject requirement, it is not inflexible. The court recognized that two or more changes will not violate the separate-vote requirement if the relationship between the two changes is a close one. *Id.* at 277. As the court phrased the test, the question whether a measure contains two or more amendments in violation of Article XVII, section 1, turns on whether the measure, if adopted, "would make two or more changes to the constitution that are substantive and that are not closely related." *Id.* Or, as this court recently summarized the *Armatta* methodology:

"To implement th[e] * * * requirement of [Article XVII, section 1], we do not search simply for a unifying thread to create a common theme, thought, or purpose from a melange of proposed constitutional changes. Instead, we inquire whether, if adopted, a proposal would make two or more changes to the constitution that are substantive and are not closely related. If so, the proposal violates the separate-vote requirement of Article XVII, section 1, because it would prevent voters from expressing their opinions as to each proposed change separately."

*Meyer v. Bradbury*, 341 Or 288, 296-97, 142 P3d 1031 (2006).

In *Armatta*, the court held that the measure at issue there contained multiple substantive changes to the constitution and that those changes were not closely related. More specifically, the court identified two pairs of changes to the constitution that were not closely related:

"For example, the right of all people to be free from unreasonable searches and seizures under Article I, section 9, has virtually nothing to do with the right of the criminally accused to have a unanimous jury verdict rendered in a murder case under Article I, section 11. The two provisions involve separate constitutional rights, granted to different groups of persons. Similarly, the right of the criminally accused to bail by sufficient sureties under Article I, section

14, bears no relation to legislation concerning the qualifications of jurors in criminal cases under Article VII (Amended), section 5(1)(a)."

*Id.* at 283-84.

In deciding whether the changes in *Armatta* were closely related, the court "considered both the relationship among the constitutional provisions affected by [the measure] and the relationship of the constitutional changes that were made in those provisions to one another." *See Lehman,* 333 Or at 245 (explaining *Armatta*). In some cases, however, the court has looked solely to the relationship between two or more changes that a measure effects in holding that the changes were not closely related. *See Swett v. Bradbury,* 333 Or 597, 608, 43 P3d 1094 (2002) (employing that methodology). But, beyond identifying those two methodologies for testing whether constitutional changes are closely related, the court has declined one party's proposal to reformulate the "closely related" standard announced in *Armatta. See Lehman,* 333 Or at 242 (explaining that party's proposed reformulation of "closely related" test would not advance inquiry). Indeed, this court has observed recently that, "if this court has written little on the subject, it is because there have been few instances in which the constitutional changes before the court presented a close question on that issue." *Meyer,* 341 Or at 300.

Finally, we add to the foregoing overview of our "separate-vote" jurisprudence the following observation from *Swett,* which (as will be seen) is particularly applicable here:

> "Ordinarily, we begin any separate-vote inquiry by identifying the changes, both explicit and implicit, that the ballot measure purports to make to the Oregon Constitution. We then determine if those changes are substantive. If they are, we then determine if those substantive changes are 'closely related.' In *Lehman,* we described that analytical process this way:
>
> > " '* * * First, we examine the relationship among the constitutional provisions that the measure affects * * *. If the affected provisions of the existing constitution themselves are not related, then it is likely that changes

> to those provisions will offend the separate-vote requirement. * * * [T]he fact that a proposed amendment asks the people, in one vote, substantively to change multiple provisions of the Oregon Constitution that are not themselves related is one indication that the proposed amendment might violate the separate-vote requirement.
>
> " 'Next, we must consider the constitutional changes themselves. That is, * * * we must determine whether the changes made to those * * * constitutional provisions are closely related. If they are closely related, the measure under consideration survives scrutiny under Article XVII, section 1. If they are not, it does not.'
>
> "The foregoing statement from *Lehman* was descriptive, not prescriptive. That is, it is equally valid analytically to start the inquiry by focusing on the changes themselves. This case illustrates the point. We need not discuss each of the steps described above, because the parties' arguments narrow the focus of our inquiry.* * *"

*Swett,* 333 Or at 607 (citations omitted) (quoting *Lehman,* 333 Or at 246 (ellipses and modifications in original)). As we shall identify, the parties to the present case have, like the parties in *Swett,* attempted to short-cut the process here by focusing their arguments primarily on the issue whether the multiple changes that Measure 3 effects are "closely related."

We turn to the various provisions of Measure 3. The parties focus, as the Court of Appeals did, on two subsections in Measure 3—subsection (3) and subsection (7). The parties agree that subsection (3) makes three substantive changes to the Oregon Constitution: (1) it makes a criminal conviction a prerequisite for a civil forfeiture; (2) it requires that proof of the elements necessary to establish forfeiture be by clear and convincing evidence; and (3) it provides that the value of the forfeited property "shall not be excessive and shall be substantially proportional to the specific conduct for which the owner of the property has been convicted." The parties disagree, however, as to whether those three substantive changes are closely related.

For the sake of the present argument, we will assume that the foregoing three statements in fact do reflect

three separate substantive changes to the Oregon Constitution. However, that assumption does not assist plaintiffs in their claim that Measure 3 violates the separate-vote requirement of Article XVII, section 1. That is so because the identified changes all are "closely related."

Our analysis in that regard ordinarily would begin with an examination of the relationship among any existing constitutional provisions that the three identified changes affect to determine if those provisions themselves are closely related. *See* 341 Or at 507-08 (quoting *Swett*). However, we find that the three changes are additions to the Oregon Constitution and have no effect on any existing constitutional provision in that document. The first change—making criminal conviction a prerequisite of civil forfeiture—requires no discussion in that regard: Neither party has made any claim that the change relates to any existing provision in the state or federal constitution. As to the second change—requiring forfeitures to be proved by clear and convincing evidence—there is some suggestion that the change alters constitutional provisions pertaining to standards of proof in criminal and other proceedings. We note, however, that the Due Process Clause of the Fourteenth Amendment to the United States Constitution generally is accepted as the source of the various constitutional standard-of-proof requirements recognized by the courts, *see, e.g.*, *In re Winship*, 397 US 354, 364, 90 S Ct 1068, 25 L Ed 2d 368 (1970) (holding that Due Process Clause requires proof beyond a reasonable doubt in criminal proceeding), and that the Oregon Constitution contains no due process clause or anything comparable to it, *State v. Miller*, 327 Or 622, 635 n 10, 969 P2d 1006 (1998).

Finally, we conclude that the third identified change—the requirement that the value of forfeited property be substantially proportional to the predicate offense—also is an addition to, and does not affect any existing provision in, the Oregon Constitution. We reject plaintiffs' suggestion that the change affects Article I, section 16, which provides that "all penalties shall be proportional to the offense." Article I, section 16, applies only in criminal proceedings, *Oberg v. Honda Motor Co.*, 316 Or 263, 274-75, 850 P2d 371 (1993), *rev'd and rem'd on different grounds*, *Honda Motor Co v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994),

while the proportionality requirement at issue speaks to a civil proceeding.

Having determined that the three identified changes do not alter or affect different provisions of the existing constitution, we may proceed to consider whether the three changes are themselves closely related. We think that it is clear that the changes are all parts of an effort to define the judicial process for forfeiture in constitutional terms. The first part of subsection (3) describes that judicial process as requiring a predicate conviction to justify commencing the process. The second part sets out the permissible standard of proof in that process. Finally, the third part of subsection (3) provides that the forfeiture process may proceed only to the extent that the forfeiture is proportional to the underlying criminal conviction. Seen in that way, the close, interconnected relationship between the three parts is clear.

Plaintiffs also point to subsection (7) of Measure 3. They contend (and, again, we assume for the sake of argument) that that subsection contains two separate substantive changes to the Oregon Constitution: (1) it prohibits using forfeited property and proceeds for "law enforcement purposes"; and (2) it establishes a priority for distributing forfeited property or proceeds. Plaintiffs recognize that neither part has any analog in the Oregon Constitution and, thus, that neither changes any existing provision of the constitution. As before, then, we need not consider whether existing provisions affected by those changes are closely related to one another: We may proceed to the question of whether the changes identified in subsection (7) are *themselves* closely related.

We conclude that the two changes are closely related, if they are separate at all. A brief illustration suffices, in that regard: If one looks at the two parts of subsection (7) in reverse order, one first considers the subsection's direction that forfeiture proceeds be distributed to "the State or any of its political subdivisions to be used exclusively for drug treatment" and *then* its prohibition on the use of proceeds for "law enforcement purposes." Viewed from that perspective, the latter provision may be seen for what it is—a *limitation* on what otherwise would be considered a proper

distribution of forfeited money "to the State or any of its political subdivisions to be used exclusively for drug treatment, unless another disposition is specially provided by law." *See Meyer*, 341 Or at 301 (explaining similar relationship). So understood, the two concepts are not separate at all; one merely delimits the other. At the very least, they are "closely related."

Finally, we turn to consider whether the changes effected by subsection (3) and the changes effected by subsection (7) are also "closely related to each other" (as before, our determination that those changes do not affect any existing provisions of the Oregon Constitution obviates any need to consider the relationship between existing provisions). Plaintiffs contend that they are not, arguing as follows: Subsection (3) provides increased procedural and substantive protections for property owners to ensure against premature, inaccurate, or excessive forfeitures. Subsection (7), on the other hand, prohibits the executive and legislative branches from using the proceeds of forfeitures for law enforcement purposes and directs how forfeiture revenues shall be used. Plaintiffs argue that the right of property owners to require the state to prove its case by clear and convincing evidence is no more closely related to the prohibition against using forfeiture proceeds for law enforcement purposes than the right of all people to be free from unreasonable searches and seizures, at issue in *Armatta*, was closely related to the right of the criminally accused to have a unanimous jury. It follows, plaintiffs reason, that, as the court held in *Armatta*, the changes contained in subsections (3) and (7) of Measure 3 are not closely related and, accordingly, constitute two or more amendments under Article XVII, section 1.

Again, we are unpersuaded. Indeed, it seems to us that plaintiffs' analysis works only if one stands as close as possible to each provision and ignores the others. To us, it is perfectly clear that the administrative detail provided in subsection (7) is closely related to the substantive changes made in subsection (3): Not only do the people wish to be assured that forfeitures are reined in, they shall encourage it by removing the carrot, which otherwise would tempt the two political branches of government to treat the criminal law as a revenue-raising source. The measure's sponsors included a

wealth of detail in the measure, perhaps suspecting darkly that, unless they did, the legislature and the executive somehow would attempt to avoid their policy concern. But we need not agree with that idea, which appears to have motivated the measure's sponsors, in order to resolve plaintiffs' claims.

Although the foregoing discussion of subsections (3) and (7) disposes of the subsections at the heart of the disagreement between the parties, we add a further and more general set of observations. Although it has several provisions, Measure 3 itself can be viewed essentially as containing two parts: the first part, encompassing subsections (3) through (6), sets out constitutional protections for property owners by creating a constitutional concept of civil forfeiture proceedings and by imposing a number of procedural protections (and accompanying limitations) in such proceedings; the second part, encompassing subsections (7) through (11), sets out an administrative process for collecting and disbursing funds derived from forfeited property. Both parts add new provisions to the Oregon Constitution; neither changes existing rights or other constitutional provisions. And, as we will discuss, the two parts reasonably can be characterized as containing various provisions that are closely related to each other under the reasoning set out in *Armatta.*

Turning to the "closely related" question, it is undeniable that a relationship exists between the two parts: The administrative funding and disbursal scheme (the second change just identified) has a place in the constitution because of the new civil forfeiture process (the first change), and it concerns the disbursal of funds derived from that process. In our view, that relationship is a stronger one than the relationships (or lack thereof) between the constitutional changes at issue in *Swett* and *Armatta. See Swett,* 333 Or at 608-09 (although changes purportedly shared same subject matter of limiting influence of money in elections, change that imposed contribution disclosure requirement was not closely related to change that imposed eligibility requirement on initiative signature-gatherers); *Armatta,* 327 Or at 283-84 (although disparate changes, including right to unanimous jury verdict in murder trials, search-and-seizure protections, right to bail, and juror qualifications were related in sense that they pertained to rights implicated during criminal

investigation or prosecution, that relationship was insufficient to render them closely related for separate-vote purposes).

From the foregoing, we think that it also is permissible to conclude that the relationship between the two parts of Measure 3 just discussed is sufficiently "close" to pass muster under Article XVII, section 1. That is, the administrative scheme set out principally in subsections (7) to (11) of Measure 3 bears a close relationship to the civil forfeiture proceeding provisions set out in subsections (3) to (6), because it would have no reason for existence were it not for those provisions. The former (*i.e.*, the administrative scheme and money flowing into and out of it) wholly derives from the latter (*i.e.*, the forfeiture proceeding provisions) and from no other source.

■■ For the reasons stated, we hold that Measure 3 does not contravene the "separate-vote" requirement of Article XVII, section 1. The contrary holding of the Court of Appeals was error. It must be reversed.[6]

The decision of the Court of Appeals is reversed. The judgment of the trial court is affirmed.

**DURHAM, J.,** specially concurring.

I concur with the decision of the plurality that the Court of Appeals erred in holding that Ballot Measure 3 (2000) was invalid under Article XVII, section 1, of the Oregon Constitution, which provides, in part:

"When two or more amendments shall be submitted in the manner aforesaid to the voters of this state at the same

---

[6] As noted, plaintiffs also advanced the notion in the Court of Appeals that Measure 3 violated the "single-subject" limitation found in Article IV, section 1(2)(d), of the Oregon Constitution. However, section 1(2)(d), which applies to statutory enactments as well as constitutional amendments, is less demanding than the separate-vote requirement of Article XVII, section 1. *See Armatta*, 327 Or at 276 (so stating). In fact, a constitutional amendment that passes muster under Article XVII, section 1, almost by definition will pass muster under Article IV, section 1(2)(d). *See id.* at 277 (stating that separate-vote requirement encompasses notion that a single constitutional amendment must contain a single subject). We therefore hold that plaintiffs' arguments under Article IV, section 1(2)(d), also are not well taken. It follows that the case need not be remanded to the Court of Appeals for further proceedings. Instead, we can affirm the judgment of the trial court by this opinion.

election, they shall be so submitted that each amendment shall be voted on separately."

However, I do not agree with all the reasoning that the plurality employs to reach its conclusion. I write separately to explain my reasons for agreeing with the plurality's ultimate conclusion.

The plurality notes that the question here, *i.e.*, whether Measure 3 contains two or more amendments to the Oregon Constitution, is a "recurring issue." 341 Or at 504. I agree that Oregon's courts and many litigants continue to struggle with the correct application of Article XVII, section 1. The problem, however, lies at least in part in the difficulty that judges and litigants face in applying this court's case law under that provision. Inconsistent and unexplained conclusions and analytical models based on subjective criteria exacerbate that problem. I discuss below some of those sources of confusion. Although analytical simplicity in this area probably is not possible, the court must be willing to examine its evolving case law to ensure that the various "tests" that it has developed continue to apply the constitution's terms faithfully. It is in the interest of that ultimate goal—accurate constitutional interpretation—that I offer the observations below.

This court has noted that Article XVII, section 1, partially shares the objective of another constitutional provision, Article IV, section 1(2)(d), which provides, in part:

> "A proposed law or amendment to the Constitution shall embrace one subject only and matters properly connected therewith."

In *Armatta v. Kitzhaber*, 327 Or 250, 275-76, 959 P2d 49 (1998), this court stated with regard to the separate-vote and single-subject requirements:

> "First, the purposes behind the two requirements are similar: Both serve to ensure that the voters will not be compelled to vote upon multiple 'subjects' or multiple constitutional changes in a single vote.

> "However, it is significant that, from the beginning of statehood, the single-subject and separate-vote requirements have been worded differently. As we have discussed,

the single-subject requirement * * * focuses upon the *content* of a proposed law or amendment, by requiring that it embrace only one subject and matters properly connected therewith. * * *

"The separate-vote requirement, by contrast, focuses upon the form of submission of an amendment, as well as the potential *change* to the existing constitution, by requiring that two or more *constitutional amendments* be voted upon separately. That is, in addition to speaking to the form of submission, the separate-vote requirement addresses the extent to which a proposed amendment would *modify* the existing constitution. That is significantly different from the wording of the single-subject requirement, which focuses in isolation upon only the text of a proposed amendment in requiring that it embrace a single subject.

"* * * Indeed, because the separate-vote requirement is concerned *only* with a change to the fundamental law, the notion that the people should be able to vote separately upon each separate amendment should come as no surprise. In short, the requirement serves as a safeguard that is fundamental to the concept of a constitution."

(Emphases in original.)

Consistently with that passage from *Armatta*, we must bear in mind the different ways in which the separate-vote and single-subject provisions apply. In particular, we must endeavor not to blur the distinctive protections that those provisions impose on the process of amending the constitution by initiative.

*Armatta* drew attention to the fact that the constitution does not define the term "amendment":

"Although Article XVII, section 1, does not define what is meant by 'two or more amendments,' it is important to note that the text focuses upon the potential *change* to the existing constitution, by requiring that two or more *constitutional amendments* be voted upon separately."

*Id.* at 263 (emphases in original). That statement is undoubtedly correct. However, it leaves open the question of the correct application of Article XVII, section 1, in two separate contexts that are pertinent to the problem in this case: (1) an amendment that modifies or repeals existing constitutional

wording either expressly or by implication; and (2) an amendment that adds new wording to the constitution that does not modify or otherwise affect the operation of existing constitutional provisions.

The *Armatta* court's discussion of two early Oregon cases sheds at least some light on the answer to that issue. The court noted that *State of Oregon v. Payne*, 195 Or 624, 635, 244 P2d 1025 (1952), confirmed that "the fact that a proposed constitutional amendment contains more than one section does not preclude its submission as a single amendment." *Armatta* at 268.

Additionally, in *Armatta* the court observed that, in *Baum v. Newbry et al.*, 200 Or 576, 581, 276 P2d 220 (1954), the court had stated:

"[The separate vote requirement] does not prohibit the people from adopting an amendment which would affect more than one article or section by implication. * * * At most it prohibits the submission of two amendments on two different subjects in such manner as to make it impossible for the voters to express their will as to each. The fact, if it be one, that the reapportionment amendment may have amended more than one section of the constitution, would be immaterial."

In summarizing the *Baum* holding, the court in *Armatta* stated:

"*Baum* stands for the following principles. First, it demonstrates that the purpose of the separate-vote requirement is to allow the voters to decide upon separate constitutional changes separately. Stated differently, Article XVII, section 1, imposes a requirement aimed at ensuring that the voters are able to express their will in one vote as to only one constitutional change. That is consistent with our textual analysis of the separate-vote requirement, which noted that the requirement focuses upon the nature of the change to the existing constitution, as well as the procedural form that an amendment takes when it is submitted to the people. Second, *Baum* demonstrates that, by implication, a single constitutional amendment may affect one or more constitutional provisions without offending the separate-vote requirement. Finally, *Baum* suggests that the separate-vote requirement encompasses, to some

extent, the notion that a single amendment must contain a single 'subject.' "

*Armatta*, 327 Or at 269.

The conclusion that *Armatta* drew from *Payne*, quoted above, seems unremarkable: A permissible single amendment may contain multiple sections. The summary of *Baum* in *Armatta* is more problematic, in part because it repeated certain conclusory, ambiguous statements of the court in *Baum*. For example, both *Baum* and *Armatta* indicate that a single constitutional amendment may "affect" one or more constitutional provisions without violating the separate-vote requirement. *Baum*, 200 Or at 581; *Armatta*, 327 Or at 269. That does not explain, however, whether the term "affect" refers to (1) a modification or repeal of one or more existing constitutional provisions; or (2) an addition of wording to an existing constitutional provision without repealing or modifying existing wording; or (3) both of the above.

Moreover, it appears that the *Armatta* court, in summarizing the final principle that it drew from *Baum*, *i.e.*, "a single amendment must contain a single 'subject[,]' " 327 Or at 269, modified the statement in *Baum* that "[a]t most [the separate vote requirement] prohibits the submission of two amendments on two different subjects in such manner as to make it impossible for the voters to express their will as to each." *Baum*, 200 Or at 581. That restatement of the holding in *Baum* is notable, and correct in my view, because it did not repeat the notion from *Baum* that the separate-vote requirement applies solely to multiple amendments that concern different "subjects."[1] The constitutional source for the requirement that a proposed amendment contain one subject and

---

[1] Notwithstanding the selective restatement in *Armatta* of the comments in *Baum*, this court said in *Hartung v. Bradbury*, 332 Or 570, 579 n 5, 33 P3d 972 (2001), that it declined the petitioners'

"invitation to revisit this court's decision in *Baum* in light of *Armatta v. Kitzhaber* * * *. Contrary to petitioners' arguments, nothing in *Armatta* suggests that *Baum* was decided incorrectly; indeed, *Armatta* cites *Baum* favorably for the proposition that Article XVII, section 1, 'imposes a requirement aimed at ensuring that the voters are able to express their will in one vote as to only one constitutional change.' *Armatta*, 327 Or at 269."

It is true that *Armatta* neither overtly criticizes nor overrules *Baum*. However, the court's summaries of the *Baum* case in *Armatta* and *Hartung* demonstrate the court's disinclination to endorse all that *Baum* had to say about the scope of the separate-vote requirement.

matters properly connected therewith is Article IV, section 1(2)(d), not Article XVII, section 1.

Armatta itself illustrates that point. In Armatta, the proposed constitutional amendments changed the effect of the existing terms of several constitutional provisions. The court held that the proposal violated the separate-vote requirement. Armatta, 327 Or at 284. The fact that the proposed constitutional amendments probably were germane to one subject, i.e., the rights of crime victims, and thus probably satisfied the single-vote requirement in Article IV, section 1(2)(d), was beside the point. As the court in Armatta put it,

> "Although the court in Baum referred to a hypothetical amendment containing multiple 'subjects,' the court did not state that, if a proposed amendment contains a single subject, then it also must be deemed to be a single amendment."

Id. at 274. Armatta went on to expressly reject the state's argument that a proposed amendment satisfies the separate-vote requirement if it satisfies the single-subject requirement. Id. at 277.

After observing that the prior Oregon cases were "lacking in detailed analysis[,]" id. at 275, the Armatta court stated:

> "We conclude that the proper inquiry is to determine whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related. If the proposal would effect two or more changes that are substantive and not closely related, the proposal violates the separate-vote requirement of Article XVII, section 1, because it would prevent the voters from expressing their opinions as to each proposed change separately."

Id. at 277. The court had no difficulty applying that test in Armatta, because the initiative measure clearly changed the substance of numerous provisions of the state constitution.

Because Armatta was an "easy" case, the court spent no time in its opinion attempting to explain how it arrived at the two announced separate-vote criteria "substantive" and

"closely related," or how they applied. However, it soon became evident that those criteria were causing confusion.

In *Dale v. Keisling*, 167 Or App 394, 999 P2d 1229 (2000), the Court of Appeals opined that, to satisfy the two criteria announced in *Armatta*, two or more substantive changes to the constitution would have to be so closely related that a vote in favor of one proposed amendment necessarily would imply a vote in favor of the other. *Id.* at 401. I refer to that test as the "necessary implication" test.

In 2002, this court addressed a challenge to Measure 3 (1992) under the separate-vote provision. In *Lehman v. Bradbury*, 333 Or 231, 37 P3d 989 (2002), this court concluded that Measure 3, which concerned term limits for various public officials, embodied multiple amendments to the constitution in violation of the separate-vote requirement.

The trial court in *Lehman* had attempted to apply the "necessary implication" test from *Dale*. On appeal, the Secretary of State complained that the "closely related" criterion from *Armatta* required clarification. *Id.* at 242. The Secretary of State urged the court to adopt the following test for determining whether multiple amendments to the constitution are "closely related":

> "[T]wo or more changes to the constitution are 'closely related' if they are so logically interrelated as to present one specific, discrete, cohesive policy choice."

*Id.*

This court refused to accept the test that the Secretary of State offered, stating:

> "Defendant apparently believes that *Armatta* needs clarification. However, adopting defendant's 'clarification' would mean that we potentially were permitting our task under Article XVII, section 1, to degenerate into an endless war of adjectives and adverbs, each battle of which would involve further efforts to explain and elaborate on whichever set of adjectives and adverbs has been used in the next preceding case. That does not mean that we would not accept a party's proposed reformulation of an existing analytical test, if it appeared that the proposed test would be a

better tool to use in future cases. Defendant's proffered test simply does not appear to us to be a better tool."

*Id. Lehman* rejected the "necessary implication" test from *Dale* as well as the adjective-laden test that the Secretary of State offered.

I agree that those proffered tests were flawed. In addition to their subjective and, thus, standardless character, they did not reflect the core requirement that *Armatta* correctly had discerned in the separate-vote requirement: A measure must embody "a particular constitutional change" that will allow voters to "express their will in one vote as to only one constitutional change." *Armatta*, 327 Or at 269.

*Lehman* easily concluded that Measure 3 proposed multiple substantive changes to the wording of different provisions of the constitution. *Lehman*, 333 Or at 244. The analysis could have stopped there, because, under the core requirement of the separate-vote rule, as this court construed that rule in *Armatta*, Measure 3 failed to offer voters "a particular constitutional change" about which the voters could express their will in one vote.

However, *Lehman* proceeded to inquire whether the multiple substantive constitutional amendments were "closely related." *Id.* The court acknowledged that *Armatta* had not explained what the "closely related" criterion meant. *Id.* However, the court took note of several of the observations that the *Armatta* court made about the proposed measure that it examined and concluded that those comments were themselves *additional* legal tests regarding the "closely related" criterion.

As a consequence of that conclusion, *Lehman* announced that the court would apply the "closely related" criterion on two separate levels. First, the court would ask whether the multiple constitutional provisions that the measure modified are themselves "closely related." *Id.* at 246. Second, the court would ask whether the constitutional changes embodied in the proposed measure are themselves "closely related." *Id.* After applying those multiple tests, the court concluded that Measure 3 violated the separate-vote requirement. *Id.* at 250.

The court's ultimate conclusion in *Lehman* remains persuasive to me. In many ways, Measure 3 was as plainly violative of the separate-vote requirement as was the measure addressed in *Armatta*. However, the *Lehman* court's elaboration of the "closely related" criterion deserves reconsideration for several reasons.

First, Article XVII, section 1, prohibits the submission to the voters of more than one amendment to the constitution for a single vote. It does not invite the submission of multiple amendments for one vote if judges decide that the affected constitutional provisions or the proposed amendments themselves have a relationship that is "close." By opening the door to the submission of multiple substantive constitutional amendments for a single vote, the court risks the emasculation of the important protection that Article XVII, section 1, embodies.

Second, the court's reliance on a test that incorporates multiple applications of a subjective, court-created phrase simply feeds an unfortunate public perception that judges execute only their personal predilections in applying the constitution. One can hardly imagine a phrase more elastic, or more lacking in some objective foundation, than "closely related." The court originally (and correctly) intended that criterion as a means of disposing of the argument that any change to more than a single word in the constitution would violate Article XVII, section 1. As *Lehman* stated,

> "[I]n any separate-vote inquiry, it is imperative that we remain aware that any amendment to the constitution involves some change to the wording of that document. However, not every one-word change to the wording of the constitution is a separate 'amendment.' If it were, then amendments to the constitution would have to happen word-by-word, and the people's power to amend the constitution would be hamstrung."

*Id.* at 240. The court should restore that focus to its analysis of whether a proposed change in constitutional wording is a separate amendment.

Third, asking whether several proposed amendments to different constitutional provisions share a "close

relationship" is, in substance, an inquiry into whether the proposals embrace one subject and matters properly connected to that subject. Stated differently, any attempt to compare and contrast the content of multiple proposed amendments to multiple constitutional provisions will quickly devolve into an effort to discover a common theme or policy choice that the component parts tend to promote. The differences in the points of discussion offered by the plurality and the dissent in this case are a good example. The respective opinions differ over whether the elements of the instant measure are or are not germane to a common subject. But that inquiry properly results from the single-subject provision, not the separate-vote provision. The plurality's present conception of the "closely related" test thus blurs the line that separates those distinctive constitutional requirements. To repeat, we must avoid confusing those separate legal requirements.

Two later cases further illustrate the difficulty that litigants face in attempting to comply with the court's "closely related" criterion. In *Swett v. Bradbury*, 333 Or 597, 43 P3d 1094 (2002), the defendants sought to defend a campaign finance disclosure measure from a challenge under Article XVII, section 1. They agreed that the proposed measure changed the operation of multiple provisions of the constitution. *Id.* at 607. However, they endeavored to point out that the measure's provisions shared a common subject, *i.e.*, " 'they are regulations designed to prevent, control, or expose the influence of money in the initiative [and] referendum * * * process.' " *Id.* at 608. The court began by noting, correctly, that:

> "More importantly, however, defendants' argument fails because it is an attempt to show that sections 1 and 3 of Measure 62 share the same *subject matter*. That may or may not be true, but it is beside the point in an analysis under Article XVII, section 1. Defendants do not focus, as they must in a separate-vote challenge, on *the particular changes made to the constitution*. See *Lehman* at 241-42 (separate-vote requirement, in contrast to single-subject requirement, focuses on extent to which proposed amendment modifies existing constitution)."

*Id.* at 609 (emphasis in original). The court also noted, correctly, that, as the parties agreed, the proposed measure altered the wording of more than one provision of the constitution. But the court then went on to assess whether those multiple alterations of the constitution bore a "close" relationship to each other. Despite the court's attempted explanation to the contrary, that assessment consisted of determining only whether the disparate changes nevertheless shared some similar policy goal or subject. The court concluded that no such relationship was present. To adopt the court's own words, that inquiry was "beside the point." *Id.*

In *Meyer v. Bradbury,* 341 Or 288, 142 P3d 1031 (2006), this court decided a separate-vote question involving a proposed measure that changed the substantive operation of two different constitutional provisions. However, the court majority concluded that the measure's alteration of the power of the Oregon legislature to enact laws regulating campaign finance was "closely related" to the measure's alteration of the people's constitutional right of free speech. *Id.* at 301. Even though the measure would not permit the voters to vote separately on those multiple, important changes to the constitution, the majority's discovery of a "relationship" that was "close" allowed it to sidestep the separate-vote requirement.

The plurality and the dissent in this case continue that kind of debate. They differ about whether the various elements of Measure 3 do or do not share a policy theme or advance a discernible lawmaking objective. But any constitutional amendment of any degree of complexity (and most legislation for that matter) almost always will embody multiple policy objectives. Analyzing a measure for the common objectives among its parts only amounts to an assessment of whether it embraces one subject and properly connected matters, not whether it contains more than one particular constitutional change, as *Armatta* stated the issue.

The plurality is correct in observing that Measure 3 adds new wording to the constitution without altering the operation of any existing provision of the constitution. The dissent's claim that Measure 3's parts affect several constitutional provisions, or analogues of those provisions, is

unpersuasive. Measure 3 creates one new, albeit complex, amendment to the existing constitution. The fact that Measure 3 contains several clauses that address distinctive policy goals that are germain to its subject is beside the point.

The plurality continues to search for close relationships between the parts of Measure 3. That search fails to advance the separate-vote inquiry. The fact that Measure 3's parts contain "a unifying principle logically connecting all provisions" in the amendment demonstrates only that Measure 3 satisfies the single-subject requirement. *See State ex rel Caleb v. Beesley*, 326 Or 83, 91, 949 P2d 724 (1997) (stating test for single-subject requirement). Rather, Measure 3 satisfies the separate-vote requirement because it embodies one constitutional change even though that change appears in a proposal with multiple parts. Measure 3 does not compel voters to engage in a single vote on two or more changes to the existing state constitution. It does not combine in one measure multiple alterations of the constitution's terms, either expressly or by implication. Thus, Measure 3 satisfies Article XVII, section 1.

I also join in the plurality's conclusion that Measure 3 passes muster under the single-subject requirement in Article IV, section 1(2)(d).

For the reasons stated above, I concur in the plurality's decision to reverse the Court of Appeals and to affirm the judgment of the trial court.

**KISTLER, J.,** dissenting.

The plurality's decision marks an abrupt departure from this court's cases applying the separate-vote requirement of Article XVII, section 1, of the Oregon Constitution. Today, the plurality concludes that all the various parts of Ballot Measure 3 (2000), which adds almost four pages of text to the Oregon Constitution, are "closely related" to each other and thus comply with Article XVII, section 1. It is worth pausing to consider the breadth of that conclusion. Among other things, Measure 3 enacts new substantive and procedural protections for persons whose property is subject to forfeiture, it prohibits the legislature from using forfeiture proceeds for law enforcement purposes, it imposes new limits on

state and federal cooperation, and it creates a new, constitutionally based agency to monitor forfeiture proceedings.

The plurality concludes that all those various provisions are closely related to each other. In my view, not only is the plurality's decision incorrect on its own terms, but the plurality cannot fairly reconcile its decision today with the decisions in *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998), and *Lehman v. Bradbury*, 333 Or 231, 37 P3d 989 (2002). This court held in *Lehman* that a measure imposing term limits on state and federal officials made two changes to the constitution that were not closely related. Measure 3 contains more numerous and more varied provisions than the measure at issue in *Lehman*. If a measure imposing term limits on government officials did not survive scrutiny under Article XVII, section 1, then neither should Measure 3. I respectfully dissent.

Article XVII, section 1, provides that, "[w]hen two or more amendments shall be submitted * * * to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately." This court carefully reviewed the text and history of that provision in *Armatta* and clarified the principles that govern our analysis of separate-vote claims. The plurality's restatement of those principles is accurate as far as it goes, but it omits a distinction that was critical to the court's holding in *Armatta* and consequently, I believe, misapplies Article XVII, section 1, in this case.

As the plurality recognizes, the separate-vote requirement imposes a stricter standard on constitutional amendments than the single-subject test imposes on legislation. As the court explained in *Meyer v. Bradbury*, 341 Or 288, 296, 142 P3d 1031 (2006), the separate-vote requirement "has a different application and is driven by a decidedly different rationale. * * * [T]he separate-vote requirement serves as a safeguard that is fundamental to the concept of a constitution."

The difference between those two standards is the level of generality at which they operate. *Armatta* held, and this court reaffirmed in *Meyer*, that "a separate-vote analysis

must focus on the *'particular changes made to the constitution.'*" *Meyer*, 341 Or at 297 (quoting *Swett v. Bradbury*, 333 Or 597, 609, 43 P3d 1094 (2002)) (emphasis in original); *Armatta*, 327 Or at 278. Unlike the single-subject test, which permits courts to define the subject of a measure at a relatively high level of generality, the separate-vote requirement requires courts to focus on the specific changes to the constitution and ask whether those specific changes are closely related. *Meyer*, 341 Or at 297.

In *Armatta*, the court explained that the various changes that Measure 40 made could be grouped under the subject of criminal procedure but that the specific changes that measure made had little relationship to each other. 327 Or at 283-84. For example, the court held that two changes to criminal procedure that Measure 40 made—involving the right to bail and juror qualifications—were not "closely related" for the purposes of the separate-vote requirement. Similarly, as noted, the measure at issue in *Lehman* imposed term limits on state and federal officials. 333 Or at 234-35. The court explained that imposing term limits on each group of officials constituted two constitutional changes and that those changes "had little or nothing to do" with each other. *Id.* at 250. That was true even though both changes could be described, at only a slightly higher level of generality, as limiting the terms that all government officials could serve.

Following those decisions, I would hold that Measure 3 makes at least four changes to the constitution that are not closely related. As the plurality recognizes, subsection (3) makes three changes to the constitution. 341 Or at 508. Two of those changes bear no greater relation to each other than the changes at issue in *Armatta* and *Lehman*. Subsection 3 requires, among other things, that the state prove forfeitures by clear and convincing evidence. It also requires that the forfeiture be proportional to the crime that gave rise to it. As the plurality notes, the first change finds an analogue in the Due Process Clause of the United States Constitution and focuses on the degree of certainty that the trier of fact must possess before he or she can forfeit property. 341 Or at 509. The other change finds analogues in Article I, section 16, of the Oregon Constitution and the Eighth Amendment to the United

States Constitution and seeks to ensure that the sanction is proportional to the crime that led to the forfeiture.

Both changes are substantive. *See Meyer*, 341 Or at 298 (defining "substantive" changes). Neither is closely related; each addresses separate concerns. The standard of proof goes to the determination whether property meets the criteria necessary for forfeiture in the first instance. The requirement that the value of the forfeited property be substantially proportional to the crime goes to the sanction that a court may impose after it finds that a forfeiture should occur. Stated more succinctly, one change goes to liability while the other goes to the sanction.

Eighth Amendment limitations on punishment present separate concerns from due process requirements of standards of proof. The two changes that subsection (3) makes to the Oregon Constitution present equally separate concerns. If the changes to two aspects of criminal procedure—bail and juror qualifications—were not sufficiently related for the purposes of the separate-vote requirement, as this court held in *Armatta*, then the procedural and substantive changes that subsection (3) makes are equally unrelated.

Those two changes should be sufficient, standing alone, to say that Measure 3 makes two substantive changes that are not closely related. Were there any doubt about the matter, however, subsection (7) resolves it. Among other things, subsection (7) modifies the authority of the legislative and executive branches; it prohibits them from using the proceeds of forfeitures for law enforcement purposes. *See Armatta*, 327 Or at 283 (holding that provision prescribing juror qualifications "limit[ed] the legislature's ability to establish juror qualifications in criminal cases"). Prohibiting the government from using the proceeds of forfeitures for law enforcement purposes arguably removes an incentive for the police to pursue criminal investigations that could lead to forfeitures. Subsection (7) thus could result in reducing the number of forfeitures, but it would do so without regard to the validity of any particular forfeiture.

Subsection (3) is directed at a different target. It grants specific substantive and procedural protections to

persons whose property is subject to a forfeiture. It seeks to protect those persons from forfeitures that precede a criminal conviction, that are not proven to a specific level of certainty, or that are excessive. To be sure, those two constitutional changes are not completely unconnected. If there are fewer forfeitures, then there will be fewer opportunities for any particular forfeiture to be premature, unproven, or excessive. But the relationship among the nature of the particular changes that subsections (3) and (7) make is far too tenuous to qualify as "close."

The plurality offers three rationales for reaching a different conclusion. None withstands scrutiny. Perhaps the most telling rationale is the one that the plurality offers at the end of its decision. The plurality begins its explanation of that rationale by stating that Measure 3 contains "essentially * * * two parts." 341 Or at 512. The plurality reasons:

> "[T]he first part, encompassing subsections (3) through (6), sets out constitutional protections for property owners by creating a constitutional concept of civil forfeiture proceedings and by imposing a number of procedural protections (and accompanying limitations) in such proceedings; the second part, encompassing subsections (7) through (11), sets out an administrative process for collecting and disbursing funds derived from forfeited property."

*Id.*

As an initial matter, in describing the "two parts" of Measure 3, the plurality does not "focus on the *particular changes made to the constitution*," as our cases direct us to do in analyzing a separate-vote claim. *See Meyer*, 341 Or at 297 (stating principle) (internal quotation marks omitted; emphasis in original). Rather, the plurality groups numerous changes under two broad headings—"procedural protections" and "administrative process."[1]

Not only does the plurality's analysis operate at too high a level of generality, but its conclusion that the two

---

[1] To illustrate, the plurality groups a prohibition against using forfeited property for law enforcement purposes and a limitation on federal-state cooperation under the heading of "administrative process for collecting and disbursing funds derived from forfeited property." And it groups "a number of" discrete rights under the heading of "procedural protections" in forfeiture proceedings.

parts of the measure are closely related rests on an incorrect premise. In concluding that the "two parts" of Measure 3 are closely related, the plurality states initially:

> "The administrative funding and disbursal scheme (the second change just identified) has a place in the constitution because of the new civil forfeiture process (the first change), and it concerns the disbursal of funds derived from that process."

341 Or at 512. It then concludes that "the administrative scheme set out principally in subsections (7) to (11)" is closely related to "the civil forfeiture proceeding provisions set out in subsections (3) to (6), *because [the administrative scheme] would have no reason for existence were it not for those provisions.*" *Id.* at 513 (emphasis added).

The premise that underlies the plurality's conclusion—that the administrative scheme set out in subsections (7) to (11) "would have no reason for existence" were it not for the civil forfeiture proceedings set out in subsections (3) to (6)—is incorrect in two respects. First, civil forfeiture is a creature of the common law, which the legislature has codified. *See, e.g., State v. Curran*, 291 Or 119, 127-29, 628 P2d 1198 (1981) (discussing common-law forfeitures and legislative codification); ORS 475A.020 (authorizing forfeiture of property used to manufacture, contain, and transport controlled substances). Second, and relatedly, subsections (3) to (6) do not create a cause of action for forfeitures. Rather, those subsections impose, as a matter of constitutional law, substantive and procedural protections on existing statutory causes of action for civil forfeitures. Contrary to the premise that underlies the plurality's reasoning, forfeiture proceedings would occur regardless of whether subsections (3) to (6) existed.

It follows that the plurality errs in asserting that the "administrative scheme" set out in subsections (7) to (11) would have no reason for existence without the forfeiture provisions in subsections (3) to (6). Even without subsections (3) to (6), there still would be an equal need (at least from the drafters' perspective) for an administrative scheme to regulate statutory forfeiture proceedings. Indeed, if the existing statutory forfeiture proceedings continued unchecked by the

procedural and substantive protections set out in subsections (3) to (6), then the need for an administrative scheme (an oversight agency and so forth) to regulate statutory forfeiture proceedings would be all the greater.

The plurality's alternative rationale for holding that subsections (3) and (7) are closely related is no more persuasive. The plurality begins its alternative rationale by observing that one can say that subsections (3) and (7) are not closely related only if "one stands as close as possible to each provision and ignores the others." 341 Or at 511. The difficulty with the plurality's use of that metaphor is that its own analysis works only if one stands as far away as possible from the specific provisions of Measure 3 and describes those provisions in only the most general terms. For example, the plurality's alternative rationale recasts the specific changes that subsection (3) makes as an "assur[ance] that forfeitures are reined in," *id.*; that is, it reduces the specific changes to a goal of limiting forfeitures. It then describes subsection (7) as "removing the carrot" from government "to treat the criminal law as a revenue-raising source." *Id.*

That is precisely what *Armatta, Swett,* and *Meyer* explain that a court must not do when it engages in a separate-vote analysis; it may not limit its analysis to searching for a common theme or policy that unites disparate parts of a proposed measure. *See Meyer*, 341 Or at 297 (explaining that "a separate-vote analysis must focus on the *particular changes made to the constitution*") (internal quotation marks omitted; emphasis in original). Otherwise, a court reduces the separate-vote requirement for constitutional amendments to a single-subject test for legislation and, in doing so, removes "a safeguard that is fundamental to the concept of a constitution." *See id.* at 296 (explaining purpose of separate-vote requirement).[2]

---

[2] For the reasons explained above, a proper focus leads to the conclusion that subsections (3) and (7) are not closely related. The latter change prohibits the use of forfeiture proceeds for law enforcement purposes. The former grants procedural and substantive protections to persons whose property is subject to forfeiture. A constitutional change that limits the instances in which forfeitures occur has only the most tenuous relationship to a change that grants separate constitutional protections to those persons whose property is subject to forfeiture.

Finally, the plurality holds that the three changes that subsection (3) makes are themselves closely related. It reasons:

"We think that it is clear that the changes are all parts of an effort to define the judicial process for forfeiture in constitutional terms. The first part of subsection (3) describes that judicial process as requiring a predicate conviction to justify commencing the process. The second part sets out the permissible standard of proof in that process. Finally, the third part of subsection (3) provides that the forfeiture process may proceed only to the extent that the forfeiture is proportional to the underlying criminal conviction. Seen in that way, the close, interconnected relationship between the three parts is clear."

341 Or at 510.

The plurality's reasoning proves too much. Using that reasoning, the court could have held in *Armatta* that the various changes to criminal procedure that Measure 40 made were, to borrow the plurality's words, "all parts of an effort to define the judicial process for [criminal trials] in constitutional terms." One part of Measure 40 described the procedures that were appropriate in setting bail; another described the types of evidence that would be admissible in criminal trials, and yet another described the number of jurors necessary to convict for certain crimes. *Armatta*, 327 Or at 278-80. To use the plurality's reasoning, "Seen in that way, the close, interconnected relationship between the three parts is clear." In my view, the changes that subsection (3) makes to forfeiture proceedings are no more closely connected than the changes that Measure 40 made to criminal proceedings. If the latter changes were not closely connected, then neither are the changes here. The plurality errs in holding otherwise.

The concurrence takes a different tack. It would hold that Measure 3 is a single amendment because it does not modify existing constitutional provisions. Instead, it merely adds new limitations to the constitution concerning a single subject—forfeitures. Before turning to the concurrence's reasoning, it is important to note that the plurality does not

accept the concurrence's position. Rather, the plurality's decision rests on the premise that Measure 3 makes more than one change to the constitution, and the plurality asks a question that the concurrence finds it unnecessary to reach—whether those changes are closely related.

The concurring opinion rests on the proposition that a measure that adds new matter to the constitution, as opposed to changing existing provisions, results in only one constitutional change. This court's decision in *Lehman* poses a hurdle for the concurrence. The measure at issue in *Lehman* added new provisions to the Oregon Constitution. 333 Or at 234 (quoting statement that measure creates "new Sections 19 and 20 in Article II"). One added a new limitation on the number of years that state representatives and senators could serve and also changed the number of years that certain statewide officials could hold office. *Id.* at 243-44. The other added a new provision regarding the number of terms that federal officials could serve. *Id.* at 244. In holding that the measure made two changes to the constitution, the court explained that the fact that the second change did not modify an existing constitutional provision was of no moment. *Id.* at 250 (explaining that the problem was not that one change was new). Rather, the problem was that the two changes had "little or nothing to do" with each other. *Id.*

*Lehman* thus stands for the proposition that the fact that a measure adds new matter to the constitution does not bear on the question whether it contains more than one amendment. But, if *Lehman* were not enough, the text of the constitution also is at odds with the concurrence's position. The Oregon Constitution provides that both the Legislative Assembly and the people may propose amendments to the constitution. Article XVII, section 1, provides that the Legislative Assembly may propose "[a]ny amendment or amendments to this Constitution," and Article IV, section 1(2)(a) provides that the people, using the initiative power, may "propose * * * amendments to the Constitution." Article XVII, section 1, also provides that, "[w]hen two or more amendments shall be submitted * * * to the voters of this

state at the same election, they shall be so submitted that each amendment shall be voted on separately."[3]

The constitutional text does not distinguish between amendments that modify existing provisions and amendments that add only new material to the constitution. Rather, the constitutional text refers to "amendment" and "amendments" without distinction. The concurring opinion does not identify any history that would support the limitation that it would read into Article XVII, section 1, nor am I aware of any. The fact that a measure adds only new matter to the constitution does not provide any basis for saying that it adds only a single amendment to that document.

Having held in *Armatta* that the separate-vote requirement in Article XVII, section 1, sets a higher standard for constitutional amendments than the single-subject test sets for legislation, we should apply that holding consistently to all the cases that come before us. Article XVII, section 1, should not expand and contract like an accordion from one case to the next. The plurality, however, would uphold Measure 3 only by effectively employing a single-subject test and, in doing so, it would depart from this court's application of the separate-vote requirement in *Armatta*, *Lehman*, and *Meyer*. If we apply those decisions consistently, we should affirm the Court of Appeals decision. I respectfully dissent.

De Muniz, C. J., and Balmer, J., join in this dissenting opinion.

---

[3] This court explained in *Armatta* that the separate-vote requirement applies to both initiated and legislatively proposed amendments. 327 Or at 261.