No. 188         March 27, 2024         599

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Christine MASON,
an individual,
*Plaintiff-Respondent
Cross-Appellant,*

*v.*

Lavonne GRIFFIN-VALADE,
Oregon Secretary of State,
*Defendant-Appellant
Cross-Respondent,*
*and*

Eric RICHARDSON,
Gary Wilhelms, and Chris Telfer,
*Intervenors-Appellants
Cross-Respondents.*

Marion County Circuit Court
22CV42660; A181565

Jennifer K. Gardiner, Judge.

Argued and submitted February 21, 2024.

Christopher A. Perdue, Assistant Attorney General, argued the cause for appellant-cross-respondent, Lavonne Griffin-Valade. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Daniel Meek argued the cause and filed the brief for intervenors-appellants -cross-respondents, Eric Richardson, Gary Wilhelms, and Chris Telfer.

Steven C. Berman argued the cause for respondent-cross-appellant. Also on the brief were Lydia Anderson-Dana and Stoll Stoll Berne Lokting & Shlachter P.C.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

Reversed and remanded on appeal; cross-appeal dismissed as moot.

**JOYCE, J.**

Article XVII, section 1, of the Oregon Constitution requires proposed amendments to the constitution to be submitted to voters in a manner that allows each amendment to be "voted on separately." Initiative petition 2024-14 (IP 14) is a proposed amendment to the constitution that aims to replace the current framework for redrawing state legislative districts after each federal census with a framework better able to minimize partisanship. It is a multifaceted proposal that revolves around the creation of an independent commission tasked with drawing district boundaries according to specified mapping criteria. Among other things, IP 14 would insulate the commission from outside interference by limiting the legislature's ability to pass laws concerning the commission's operation and by imposing a number of qualifications and disqualifications for commissioners based on the political affiliations and activities of the commissioners and their family members. It also establishes procedural, budgetary, and staffing provisions necessary to carry out the day-to-day operation of the commission. The question before us is whether this multifaceted initiative complies with our constitution's "separate vote" requirement. We conclude that it does.

## I.   PROCEDURAL HISTORY

The chief petitioners filed the prospective petition for IP 14 with the Secretary of State. Plaintiff submitted comments to the secretary, asserting that IP 14 failed to comply with the separate-vote requirement. The secretary disagreed, concluding that IP 14 conformed to all procedural requirements of the constitution. Plaintiff then initiated this proceeding, challenging the secretary's determination and seeking declaratory and injunctive relief. The trial court allowed chief petitioners to intervene in opposition to plaintiff's claims.

The parties filed cross-motions for summary judgment. After a hearing on those motions, the court ruled that IP 14 violated the separate-vote requirement, granting plaintiff's motion in part and denying the secretary's motion. The court stayed its judgment pending the outcome

of an appeal, and it denied plaintiff's request for additional declaratory and injunctive relief, which would have prevented IP 14 from continuing through the initiative process while awaiting the resolution of an appeal.

The secretary and intervenors appeal, challenging the denial of their summary-judgment motions and the granting in part of plaintiff's motion. Plaintiff cross-appeals, challenging the denial of the additional declaratory and injunctive relief described above.

There are no factual disputes in this case; therefore, the question of whether IP 14 complies with the separate-vote requirement is an issue of law that we review for legal error. *See Anantha v. Clarno*, 302 Or App 196, 200, 461 P3d 282 (2020) (applying that standard in an analogous context). We ultimately conclude that the court erred in ruling that IP 14 violated the separate-vote requirement, and we reverse and remand the judgment on that basis, which renders plaintiff's cross-appeal moot.

## II.    THE PROVISIONS OF IP 14

In the words of its preamble, IP 14 aims to prevent gerrymandering by establishing "an independent commission to draw fair and impartial districts so that every vote matters." It contrasts its proposed framework with the current one, in which "Oregon politicians draw the boundaries for their own state legislative districts." To accomplish its goal, IP 14's provisions are detailed and cover various aspects of the commission's operation.

First, IP 14 would repeal Article IV, section 6,[1] of the Oregon Constitution and replace it with a provision consisting of 13 subsections. The new section would establish the Citizens Redistricting Commission made up of 12 commissioners, and it would authorize the Secretary of State to adopt rules to ensure the commission's effectiveness and to initiate a process to allow individuals to apply to the commission. It would also establish the qualifications and disqualifications for commissioners. For example, with some exceptions, to qualify for the commission, applicants must

---

[1] Article IV, section 6, sets out the current process for defining and apportioning legislative districts.

be eligible to vote and must have been an Oregon resident for the preceding two years, have been registered with the same political party (or unaffiliated) for the last three years, and have voted in two of the last three general or tribal elections. In contrast, a person is disqualified from the board if, within three years of their application, the person or their close family members have been:

- A holder of or candidate for elective office;

- An officer, employee, or paid consultant of a political party;

- A member of a political party central committee;

- An employee or contractor for a campaign committee for federal or state office;

- A registered lobbyist;

- A paid congressional or state legislative employee;

- A member of an elected official's staff or a contractor of an elected official; or

- An individual who has contributed more in a calendar year to any single candidate for federal or state office than the amount allowed per election by federal law for contributions to federal candidates.

Additionally, after a commissioner's term of service, they are temporarily prohibited from seeking elected office, working for an official appointed by the state or federal legislature, serving as a consultant for a state or federal legislative candidate, and acting as a lobbyist.

The new section 6 would also establish a panel to review applicants for the commission, which would identify a pool of qualified candidates, of which a third would be members of the largest political party, a third would be members of the second largest party, and a third would be members of neither of those parties. From that pool, the Secretary of State would randomly select six commissioners (two from each category listed above), and those six commissioners would select six additional commissioners (again, two from each category listed above). The new section would authorize the governor to remove commissioners in very

limited circumstances, and it would provide for the filling of vacancies.

Additionally, the new section 6 would allow the commission to hire necessary staff and consultants, and it would authorize the Secretary of State to provide staff and office support to the commission. It would authorize per diem compensation for commissioners and protect commissioners from negative employment consequences due to their participation in the commission. It would require the legislature to fund the commission as necessary to fulfill the commission's obligations and prohibit the legislature from reducing the commission's budget below that of the preceding years.

Finally, the proposed section 6 would insulate the commission from the legislature by prohibiting the legislature from passing laws that directly impact the functioning of the commission, except to appropriate money to the commission or to adopt verbatim legislative acts recommended by the commission itself.

Next, IP 14 would repeal and replace Article IV, section 7.[2] The new section 7 would require open and transparent processes to allow for public participation. It would establish quorum and voting rules. It would establish specific criteria for the drawing of legislative districts. Finally, it would authorize the Oregon Supreme Court to review the maps proposed by the commission and grant it original and exclusive jurisdiction over any challenge to a certified final map.

## III.    THE SEPARATE-VOTE REQUIREMENT

Having described IP 14, we turn to the question whether it violates the separate-vote requirement. Article XVII, section 1, provides that, "[w]hen two or more amendments shall be submitted *** to the voters of this state

---

[2] Article IV, section 7, provides:

"A senatorial district, when more than one county shall constitute the same, shall be composed of contiguous counties, and no county shall be divided in creating such senatorial districts. Senatorial or representative districts comprising not more than one county may be divided into subdistricts from time to time by law. Subdistricts shall be composed of contiguous territory within the district; and the ratios to population of senators or representatives, as the case may be, elected from the subdistricts, shall be substantially equal within the district."

at the same election, they shall be so submitted that each amendment shall be voted on separately." The purpose of that requirement, which we further explore below, is to ensure that voters are not forced to cast a single vote for or against what are, essentially, multiple standalone constitutional amendments. *Armatta v. Kitzhaber*, 327 Or 250, 275, 277, 959 P2d 49 (1998).

To analyze whether a proposal satisfies the separate-vote requirement, we follow the framework established in *Armatta*. That framework looks to (1) whether the proposal would make two or more changes to the constitution, (2) whether those changes are "substantive," and (3) whether those changes are "closely related." *Id.* at 277. Under that rubric, a proposal satisfies the separate-vote requirement if it makes only a single substantive change or if its multiple substantive changes are "closely related." *Id.*

Here, the parties agree that IP 14 proposes multiple substantive changes to the constitution—although they disagree as to the number and nature of those changes. The mere existence of more than one substantive change means that our analysis necessarily turns on whether the multiple substantive changes are "closely related."

A.  *Understanding the "Closely Related" Standard within the Context and Purpose of the Separate-Vote Requirement*

Determining whether changes are "closely related" is a challenging endeavor because, by its very nature, it is not an analysis well-suited to brightline or categorical rules. The Oregon Supreme Court has primarily employed two factors to help determine whether substantive changes are "closely related" or not. In the first factor, the court examines the preexisting provisions of the constitution that will be affected either explicitly or implicitly by the proposal and asks whether those provisions are closely related. *Lehman v. Bradbury*, 333 Or 231, 246, 37 P3d 989 (2002). In the second factor, the court examines the changes that would be implemented by the proposal itself to determine whether those changes are closely related to each other. *Id.* Because those two factors can only be understood and applied with an understanding of their greater context and purpose, we

turn back to *Armatta* and its description of the principles animating the separate-vote requirement and, by extension, the "closely related" inquiry.

First, in *Armatta*, the court observed that the separate-vote requirement originated as part of a larger provision aimed at allowing the constitution to adapt to "a change of popular sentiment" about subjects like the establishment of a state bank, slavery, or the rights of women. *Armatta*, 327 Or at 265 (quoting H. Fowler, 2 *Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana*, 1258-59 (1850) (statement of James G. Read) (emphasis omitted)). From that origin, the court recognized that the separate-vote requirement operates to restrict such proposals in scope to making "particular, specific changes to the constitution." *Id.*

Second, drawing on *Baum v. Newbry et al.*, 200 Or 576, 267 P2d 220 (1954), the court explained that the separate-vote requirement aims to ensure that "voters are able to express their will in one vote as to only one constitutional change." *Armatta*, 327 Or at 269. That is, "the purpose of the separate-vote requirement is to allow the voters to decide upon separate constitutional changes separately." *Id.*

Third—again drawing on *Baum*, in which the court upheld a lengthy and detailed amendment regarding legislative redistricting in the face of a separate-vote challenge—the court recognized that a single proposal "may affect one or more constitutional provisions without offending the separate-vote requirement." *Id.* Put differently, the separate-vote requirement does not restrict a proposal based solely on the breadth of its impact on existing provisions of the constitution—it is not a rule that limits the complexity of a proposal. *See Lincoln Interagency Narcotics Team v. Kitzhaber*, 341 Or 496, 503, 513, 145 P3d 151 (2006) (*LINT*) (holding that a lengthy measure complied with the separate-vote requirement despite the fact that it had "more in common, both in appearance and in substance, with legislation than with constitutional amendments").

Finally, the separate-vote requirement "encompasses, to some extent, the notion that a single amendment must

contain a single 'subject.'" *Armatta*, 327 Or at 269. In fact, this principle necessarily emerges from the two that precede it. After all, if voters cannot be compelled to cast a single vote for multiple proposals—and yet a proposal is not restricted merely by its complexity or the breadth of its effect on existing constitutional provisions—then the separate-vote requirement must establish some type of content-based limitation. The court explained the nature of that limitation by comparing the separate-vote requirement with the single-subject requirement of Article IV, section 1(2)(d). *Id.* at 272-75.

The single-subject requirement exists to prevent "log-rolling," *i.e.*, "the practice of inserting two or more unrelated provisions into a single bill * * * so that legislators favoring one provision would be compelled to vote for the bill despite their opposition to the other provisions." *Id.* at 273. It requires a measure to contain "a unifying principle logically connecting all provisions in the act [or amendment], such that it can be said that the measure embraces one subject only." *Id.* (quoting *State ex rel Caleb v. Beesley*, 326 Or 83, 91, 949 P2d 724 (1997) (brackets in *Armatta*)).

The main similarity between the single-subject and separate-vote requirements is that "[b]oth serve to ensure that the voters will not be compelled to vote upon multiple 'subjects' or multiple constitutional changes in a single vote." *Id.* at 275. The main difference is that the single-subject requirement "concerns only the *text* of the proposed amendment viewed in isolation," *id.* at 270 (emphasis in original), whereas the separate-vote requirement "focuses upon the form of the submission of the amendment, as well as the potential *change* to the existing constitution," *id.* at 276 (emphasis in original). Stated slightly differently, the separate-vote requirement incorporates the single-subject analysis, but it goes further. *Id.* at 277. It examines the effects of a proposal on the constitution itself.

From those principles, the Supreme Court concluded that "the proper inquiry" in applying the separate-vote requirement "is to determine whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related." *Id.* If

it would, "the proposal violates the separate-vote require-
ment \*\*\* because it would prevent voters from expressing
their opinions as to each proposed change separately." *Id.*
Given the nature of those animating principles, it is evident
that the simple phrase "closely related" describes a rather
complex concept. Ultimately, the touchstone is whether a
proposal contains in a single package what could just as
effectively be broken into two.

B.   *Using the Two Factors Identified in* Lehman *to Apply the
     "Closely Related" Standard*

        The challenge lies in answering that question of
divisibility: When can a proposal just as effectively be broken
into two? It is not the court's role to judge the motivations of
the drafters of a measure or the substantive merits, viabil-
ity, or advisability of a given proposal—our role is simply to
make sure a proposal complies with the form required by the
constitution. *See id.* at 284 ("\*\*\* Article IV, section 1, grants
the people the power to change the Oregon Constitution as
they so desire, including modifying or repealing a provi-
sion of the Bill of Rights, so long as the proposed change
or changes comply with the constitutional requirements for
amending the constitution."). Mindful of that limitation, we
return to the two factors identified by the Supreme Court in
*Lehman* and the different ways in which those factors have
functioned as a diagnostic tool in different circumstances.
Again, the first factor asks whether the preexisting provi-
sions of the constitution that will be affected either explic-
itly or implicitly by the proposal are closely related. *Lehman*,
333 Or at 246. The second asks whether the changes made
by the proposal itself are closely related. *Id.* The court's reli-
ance on one or both of those factors has varied depending on
the nature of the proposal at issue.

        *League of Oregon Cities v. State of Oregon*, 334 Or
645, 56 P3d 892 (2002), is an example of a case in which the
separate-vote analysis turned primarily on the first factor.
There, the court addressed Ballot Measure 7 (2000), which
sought to amend Article I, section 18, to require the state
to pay just compensation to property owners for any reduc-
tion in the value of real property resulting from a restrictive
regulation. *Id.* at 665-67. However, the measure contained

an important caveat to its property protection—it did not require compensation for regulations that prohibited "selling pornography, performing nude dancing, selling alcoholic beverages or other controlled substances, or operating a casino or gaming parlor." *Id.* at 668. The court found that that caveat had a rather profound impact on the Article I, section 8, right to free expression. *Id.* at 671-72. Under Article I, section 8, the state or a local government may not deny a generally available benefit to a property owner due to expressive activity. *Id.* at 671. But Measure 7 explicitly allowed that disparate treatment and "essentially plac[ed] a price tag upon the property owner's right of free expression." *Id.* at 672.

Ultimately, the court held that the existing constitutional provisions affected by the measure—Article I, section 18 (a regulatory-takings provision) and Article I, section 8 (a free-speech provision)—bore "no relation to each other." *Id.* at 674. That lack of relationship highlighted the core problem with the measure. Rather than presenting one core proposal to voters, Ballot Measure 7 contained one core proposal and a constitutional *non sequitur* that restricted the freedom of expression.

*Swett v. Bradbury*, 333 Or 597, 43 P3d 1094 (2002), is an example of a case in which the second factor was most useful. In *Swett*, the court evaluated Ballot Measure 62 (1998), which required the disclosure of certain political contributions and required that petition-signature gatherers be registered Oregon voters. *Id.* at 599-600. In applying the second factor, the court considered the purported purpose of the measure, which was "designed to prevent, control, or expose the influence of money in the initiative [and] referendum *** process." *Id.* at 608-09 (alterations in *Swett*). The court took issue with the voter-registration requirement for signature gatherers, noting that the defendants "fail to explain how *** [that] requirement *** bears any relationship to the suggested design." *Id.* That discrepancy revealed that the measure actually contained two freestanding proposals, and it could have been broken apart to allow voters to separately decide "whether to require disclosure of campaign contributions and/or impose a requirement that signature gatherers for initiative petitions be registered

Oregon voters." *State v. Rogers*, 352 Or 510, 523, 288 P3d 544 (2012).

The Supreme Court also found the second factor to be largely dispositive in *Rogers*—in that instance, to confirm that a proposal *complied* with the separate-vote requirement. *Id.* at 522-24. In *Rogers*, the court analyzed Ballot Measure 6 (1984), which provided:

> "Notwithstanding sections 15 and 16 of this Article, the penalty for aggravated murder as defined by law shall be death upon unanimous affirmative jury findings as provided by law and otherwise shall be life imprisonment with minimum sentence as provided by law."

*Id.* at 514. Challenging the measure on separate-vote grounds, the defendant argued that the measure made multiple changes to the existing provisions of the constitution, because it limited the scope of the constitution's ban on "vindictive justice," its ban on "cruel and unusual punishment," and its requirement of proportionate penalties. *Id.* at 518.

The court agreed that the measure implicated those three constitutional provisions. *Id.* at 521-22. But it recognized that "Measure 6 *** contains only one provision and proposes to do only one thing—prescribe the penalty for aggravated murder." *Id.* at 522. Its effects on existing constitutional provisions were directed only "at eliminating the potential constitutional barriers to the imposition of that penalty." *Id.* Stated differently, the court recognized that "the three changes that the measure makes to Article I, sections 15 and 16, are necessary corollaries to the new provision that permits the imposition of the death penalty." *Id.* at 523.

What *Rogers* demonstrates is that, so long as a measure's provisions are themselves closely related and the measure's effects on existing constitutional provisions are limited to those necessary to allow the measure to function, the first factor is of little utility. Regardless of the relationship between those existing provisions, the measure cannot be broken apart and presented to the voters in separate initiatives without compromising the "scheme that is at the measure's heart." *Id.* at 525.

Although *Rogers* is the starkest example of that principle, the plurality took a similar approach in *LINT*. There, the Supreme Court addressed Ballot Measure 3 (2000), which "impose[d] various procedural and substantive limitations on forfeiture proceedings, establishe[d] priorities for and limitations on the distribution of forfeiture proceeds (including proceeds from federal forfeiture proceedings that are available to the state), create[d] a state agency to monitor and report on forfeitures, and provide[d] a civil penalty for violating its provisions." *LINT*, 341 Or at 503. As opposed to the short and simple provision at issue in *Rogers*, the measure in *LINT* was rather lengthy and followed "the unfortunate practice, sometimes questioned, of inserting provisions in the state constitution that have more in common, both in appearance and in substance, with legislation than with constitutional amendments." *Id.*

Nonetheless, the crux of the separate-vote issue was the relationship between two parts of the measure. One part of the measure set out constitutional protections for property owners by prohibiting civil forfeiture unless the owner had been convicted of a crime and there was clear and convincing evidence that the property was an instrumentality or proceed of that crime. *Id.* at 512. The second part set out an administrative process for collecting and disbursing funds derived from forfeited property, including a provision that directed those funds to be spent on drug-treatment services and prohibited their use for law-enforcement purposes. *Id.* The measure itself did not affect preexisting provisions of the constitution, *id.* at 509, so the question reduced to whether those two parts of the measure were "closely related" to each other.

The opponents of the measure argued that those two parts of the measure were no more closely related than the measure that the court disapproved of in *Armatta*. *Id.* at 511. In essence, they argued that a directive to the legislative and executive branches about the permissible uses of forfeiture proceeds was not a necessary corollary to increasing property protections by narrowing the availability of forfeiture in the first place. *Id.*

The plurality disagreed. It explained that those objections required one to "stand[ ] as close as possible to

each provision and ignore[] the others." *Id.* Taking into account the purported goal of the measure—which was to "rein[] in" forfeitures and "remov[e] the carrot, which otherwise would tempt the two political branches of government to treat the criminal law as a revenue-raising source"—the court concluded that the "administrative funding and disbursal scheme *** ha[d] a place in the constitution because of the new [more limited] civil forfeiture process." *Id.* at 512. In other words, the second part of the measure "wholly derive[d]" from the first. *Id.* at 513.

The plurality's reasoning in *LINT* is consistent with what we understand to be the rule in *Rogers*: Where application of the second factor shows that a measure is incapable of being broken apart and presented to voters in separate freestanding proposals without undermining the "scheme that is at the measure's heart," then the measure must necessarily satisfy the separate-vote requirement. *Rogers*, 352 Or at 525. In such situations, the ripple effects that the measure may send throughout diverse provisions of our constitution do not offend the separate-vote requirement so long as they are limited to those "necessary to give effect" to that scheme. *Id.* In such situations, "a separate vote on whether those effects should logically follow [is] not possible," because a voter cannot cast a vote in favor of measure's core proposal without endorsing the necessary corollaries that make the proposal possible. *Id.*

## IV.   APPLICATION

Turning to IP 14, we recognize that the measure's stated purpose is to establish an independent commission that will draw "fair and impartial districts" and not be unduly influenced in the execution of that duty by conflicts of interest or partisanship. Consequently, our analysis turns on whether IP 14 is one standalone proposal aimed at that goal or whether it is capable of being presented to the voters in separate standalone proposals. We start our analysis with the second factor because, tracking the reasoning of *Rogers* and the plurality in *LINT*, we find it to be dispositive.

IP 14 seeks to completely replace Article IV, sections 6 and 7, of the constitution. Its replacement for section 6 contains 13 subsections that establish a redistricting commission:

- Subsection (1) establishes a Citizens Redistricting Commission consisting of 12 commissioners.

- Subsection (2) authorizes the Secretary of State to adopt rules necessary to facilitate the application and selection of commission members.

- Subsection (3) authorizes the Secretary of State to initiate an application process that promotes "a diverse and qualified applicant pool." It then sets out a long list of qualifications and disqualifications for applicants to the commission.

- Subsection (4) provides for the creation of a review panel made up of administrative law judges tasked with creating an applicant pool for the commission.

- Subsection (5) sets out a process by which the review panel will select a pool of 150 applicants.

- Subsection (6) instructs the Secretary of State to "randomly select by lot" six applicants from that pool to serve as commissioners.

- Subsection (7) authorizes those six commissioners to select six more from the applicant pool.

- Subsections (8) and (9) contain provisions regarding the removal of commissioners for neglect, incapacity, or misconduct and for the filling of out-of-cycle vacancies.

- Subsection (10) authorizes the commission to hire necessary staff and consultants, orders the Secretary of State to provide staffing and office support as needed, provides for the payment of commission members, and establishes employment protections for commissioners.

- Subsection (11) establishes the term of the commissioners' service and sets a waiting period on a former commissioner's ability to seek elective office, work or consult for the state or federal legislature, or work as a lobbyist.

In short, subsections (1) through (11) provide for the creation and day-to-day operation of the nonpartisan citizen committee that is at the very heart of IP 14. We find those provisions

to be "closely related," as we are hard pressed to identify a way that those provisions could logically be subdivided and presented to voters as separate proposals—nor has plaintiff proposed one. As was the case in *LINT*, all of the subsections are "wholly derived" from the establishment of the Citizens Redistricting Commission and have no function apart from that commission.

Continuing to subsection (12), that subsection requires the legislature to appropriate the funds "necessary to permit the commission to fulfill the commission's obligations," and it prohibits the legislature from reducing the commission's budget to a level below that of the previous redistricting cycle. Meanwhile, subsection (13) prohibits the legislature from enacting laws that directly impact the functioning of the commission, unless three prerequisites are satisfied: (1) the commission votes to seek legislation that enhances its ability to carry out its function, (2) the commission provides the requested language to the legislature, and (3) the legislature enacts that language verbatim.

Those two subsections serve to insulate the commission from interference by the legislature—either by the tightening of the purse strings or by direct legislative interference. As with the prior 11, subsections 12 and 13 exist only to support the function of the commission and have no independent purpose for existence in the absence of the commission. Furthermore, we cannot see how those provisions can be removed from IP 14 and presented to voters in a separate amendment without undermining the scheme at the heart of IP 14—a redistricting commission safe from the influence of politically interested legislators.

That brings us to section 7 and its subsections. Whereas section 6 would establish the commission and provide for its administrative functioning, section 7 sets out the guidelines for the commission itself:

- Subsection (1) directs the commission to conduct an open and transparent process, to draw district lines in accordance with map criteria to follow, and to conduct its business with integrity, impartiality, and fairness.

- Subsection (2) establishes quorum and voting rules.

- Subsection (3) requires public notice of meetings and hearings and makes the commission's records and data publicly available.

- Subsection (4) sets out the mapping criteria that the commission is directed to use.

- Subsection (5) orders the commission to hold a certain number of public hearings and facilitate public accessibility to those hearings.

- Subsection (6) sets a timeline for the adoption of final maps and a procedure for use when the commission does not approve a final map.

- Subsection (7) establishes a mechanism for judicial review of redistricting maps.

- Subsection (8) provides that the measure supersedes any conflicting provisions of the constitution and allows for the severability of invalid portions of the measure.

Again, we find all of these subsections "closely related" to each other and to the provisions in section 6. Each subsection serves to set out the means by which the commission is to carry out its task and provides alternatives for conflicts that may arise—either between members of the commission or before the courts. We cannot say that any subsection could be separated from IP 14 and presented to voters as its own amendment without compromising the purpose of IP 14.

Turning back to the first *Lehman* factor, we acknowledge plaintiff's argument that IP 14 would have wide-ranging effects on the existing provisions of our constitution if enacted, and that those provisions are not themselves closely related. For example, plaintiff argues that the qualifications and disqualifications for commissioners alone would implicitly affect the freedom of expression contained in Article I, section 8; the privileges-and-immunities clause of Article I, section 20; the freedom of assembly in Article I, section 26; and the political-contribution provision of Article II, section 8(2)(a). With regard to the function of the commission and its insulation from the budgetary and legislative power of the legislature, plaintiff argues that

IP 14 would make implicit changes to Article III, sections 1 and 2, and Article VI, sections 1 and 18.

While we doubt that the implicit effects of IP 14 are quite as extensive as plaintiff fears, we readily acknowledge that IP 14 may make many implicit changes to existing provisions of our constitution. Even still, we conclude that IP 14 complies with the separate-vote requirement. That is because, insofar as IP 14 makes those changes, they are limited in scope. Except for the explicit replacement of Article IV, sections 6 and 7, IP 14 does not render other provisions wholly inoperable. Instead, its implicit changes are limited to those necessary to effectuate the "scheme at the measure's heart"—the creation of a nonpartisan redistricting commission. As was the case in *Rogers*, such implicit changes are "necessary corollaries" to the creation and function of that commission as intended.

In the end, we have a limited role to play in how Oregonians employ the initiative process for their own self-governance, asking only whether Oregonians are able to cast one vote for each constitutional change proposed. In keeping with the analysis in *Rogers* and *LINT*, we are unable to conceptualize a way in which IP 14 could be subdivided and presented to voters in separate proposals without undermining the very function and goal of IP 14. As such, we conclude that the multiple substantive changes that it makes are "closely related" and, thus, comply with the separate-vote requirement. Accordingly, we conclude that the trial court erred in granting in part plaintiff's motion for summary judgment and denying defendant's motion for summary judgment, and we reverse and remand for entry of judgment consistent with our decision.

Reversed and remanded on appeal; cross-appeal dismissed as moot.